**STATE of Missouri, Plaintiff-Respondent,**

v.

**Angela JOHNSON, Defendant-Appellant.**

No. 49088.

Missouri Court of Appeals, Eastern District, Division Three.

Oct. 14, 1986.

Motion for Rehearing and/or Transfer Denied Nov. 18, 1986.

Application to Transfer Denied Jan. 13, 1987.

William L. Webster, Atty. Gen., Lee A. Bonine, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Kandice K. Johnson, Columbia, for defendant-appellant.

SIMON, Judge.

Appellant, Angela Johnson, appeals from a conviction of manslaughter. § 565.004 RSMo 1978. Following a jury verdict in the Circuit Court of Cape Girardeau County, she was sentenced to a prison term of ten years.

On appeal, appellant contends the trial court erred in: (1) overruling her motion in limine thus allowing evidence of other crimes to be admitted at the trial; (2) limiting the number of character witnesses she was allowed to call; (3) refusing to allow appellant's expert to testify to an experiment he performed; (4) in failing to submit MAI–CR 2.28, an excusable homicide instruction, prejudicing her by depriving her of a defense supported by the evidence; (5) overruling her request to strike a venireman for cause when comments elicited dur-

ing voir dire established a questionable ability to sit as a fair and impartial juror. We affirm.

Appellant does not contest the sufficiency of the evidence. A brief statement of the facts will suffice. Additional relevant facts will be presented upon consideration of appellant's points.

Appellant was charged with the death of her 25 month old daughter, Latasha. Approximately 19 months prior to Latasha's death, the child was treated for a broken arm at Southeast Missouri Hospital. The child was also diagnosed as being severely undernourished when examined and the arm was diagnosed as being broken for two days prior to the hospital visit.

Latasha Johnson died on November 29, 1983. An autopsy was performed by the medical examiner for the City of St. Louis. The autopsy revealed numerous bruises on the victim's legs and buttocks, some that were so deep that the tissue was excised from the bone. The body had numerous burns that were the shape and depth of cigarette burns. The cause of death was determined to be a subdural hematoma caused by a blunt trauma to the victim's head.

Appellant's first point relates to the trial court's refusal to grant appellant's motion in limine to prevent the state from introducing any evidence regarding an incident that occurred 19 months prior to the death of her child. The trial court overruled the appellant's motion in limine and expressly limited evidence on the 1982 "failure to thrive" matter to evidence of a prior condition or history of the child. The evidence concerned a March, 1982 incident in which the victim was removed from appellant's custody. The victim was treated at Southeast Missouri Baptist Hospital in March, 1982, for a broken arm and was found to be severely underweight. The arm had been broken for two days before the victim was brought in for treatment. The treating doctor, Dr. James Dinkins, M.D., testified that the victim appeared to be suffering both from abuse and neglect. The victim's height at that time was in the fiftieth (50)

percentile for her age, however, her weight was only in the tenth (10th) percentile. When she was placed in the foster home she weighed eleven (11) pounds and was unable to lift her head because she was so weak. During the two months she was in foster care the victim became more active, stronger, and gained six pounds.

It is appellant's contention that testimony was introduced at trial, by four of the state's witnesses, solely for the purpose of creating the impression that appellant was guilty of the crime of child abuse and neglect, and that appellant was a person of bad character and therefore likely to have committed the offense charged. The state asserts, relying on *State v. Letterman*, 603 S.W.2d 951, 954 (Mo.App.1980), that the evidence offered to the court was used to show absence of mistake or accident, intent, and common scheme or plan, in complete compliance with the trial court's limitation.

■ The appellant did not preserve the issue by trial objections and further offered evidence on the same issue during trial. We find no manifest injustice. The appellant's point regarding the improper introduction of evidence at trial is thus without merit. Rule 29.12(b).

Appellant asserts in Point II that the trial court erred in limiting the number of appellant's character witnesses to three when appellant offered thirteen witnesses. The settled rule is that it is within the sound discretion of the trial court to limit the number of witnesses who testify to defendant's good or bad reputation. *State v. Lamb*, 141 Mo. 298, 42 S.W. 827 (Mo. 1897). This rule was narrowed by our Supreme Court in *State v. Demaree*, 362 S.W.2d 500 (Mo. banc 1962) where the court held that character witnesses testifying regarding a specific trait of the defendant tending to show the improbability of defendant committing the crime charged should not be limited by any specified number of witnesses prior to trial.

In the instant case appellant was allowed to call three separate specific character wit-

nesses, because appellant's four previous witnesses were also character witnesses. The trial court ruled that further character witnesses would be repetitive and cumulative.

Appellant argues that the state's witnesses regarding the prior incident were by inference testifying to the bad character of appellant. Appellant further argues that the court should allow these witnesses to be rebutted by additional character witnesses for the appellant. The state argues that their witnesses were not addressing the issue of the appellant's character, but rather were showing the appellant's intent, and her common plan or scheme. The state made no objections to the appellant's offer of thirteen character witnesses. The trial court ruled on the issue sua sponte. The appellant further contends that the trial court was arbitrary in the limitation of only three character witnesses.

The discussion between appellant's counsel and the court displays the nature of the court's use of discretion.

THE COURT: How many more witnesses do you have, Mr. Robbins?

DEFENSE COUNSEL: Right now, one, two—sixteen.

THE COURT: I understand that fourteen or thirteen of them are character witnesses.

DEFENSE COUNSEL: Approximately thirteen of them are character witnesses.

THE COURT: The Court will rule that you have three witnesses you can select.

Any three out of the thirteen you want for the issue of character. And, we will let you use those three.

If you want to make an offer of proof

DEFENSE COUNSEL: Yes, your Honor. I will want to bring in the other character witnesses to the stand and have them testify as to what information they could offer as if called as a witness to testify in front of the jury.

THE COURT: Tell me what information you have.

DEFENSE COUNSEL: Judge, I believe they will be testifying as to good character of Angela Johnson in the community.

THE COURT: Anything else?

DEFENSE COUNSEL: I think they will testify as to their personal knowledge and the making and observing of their observations regarding her as the basis for her good character within the community; observations of her with her children, observations of her in the family setting, relationships they have had with her over the years.

And, we will be discussing the personality traits of her.

THE COURT: Now, I am going to give you three of those thirteen. You have already had about five or six, including the last three witnesses who testified to the same thing.

DEFENSE COUNSEL: But your Honor, they weren't character witnesses. They were brought in regarding the failure to thrive and broken arm incident that the State—

THE COURT: Mr. Robbins, it is clear that a rose by any other name is still a rose, and the same testimony you are going to get out of the thirteen you can get out of the three.

Upon review of the testimony of the three character witnesses and the defendant's prior witnesses, we conclude that the trial court's concerns regarding the nature of the witnesses' testimony was well founded. The witnesses all testified to essentially the same facts and opinions.

■ Cases cited by appellant are not dispositive of the question of the court limiting the number of witnesses under these particular conditions. In *State v. Demaree*, 362 S.W.2d 500 (Mo. banc 1962), which appellant discusses extensively, our Supreme Court upheld a trial court's limitation on the number of character witnesses on behalf of defendant as the limitation did not intrude on the defendant's right to a fair trial. We find that the analysis described in *Demaree* leads to a conclusion that the trial court did not unjustly limit the number of character witnesses in this instance.

In *Demaree*, at 506, an analysis based upon the following considerations was made:

A) nature of the cross examination by state of appellant's character witnesses;

B) the number of state's witnesses testifying to appellant's bad character;

C) whether or not there was a denial of rebuttal testimony.

Although the appellant claims that these factors lead to the conclusion that additional character witnesses should have been allowed by the trial court, we find differently. The state's cross examination of appellant's character was not out of the ordinary. The state's questions in cross examination were not abusive to the witnesses. The state's witnesses testified as to the prior incident and not to appellant's reputation in the community. The state did not offer witnesses to appellant's bad reputation. Rebuttal testimony was properly allowed by the trial court as appellant was able to offer three witnesses in rebuttal. Appellant's point is not well taken.

In her third point, appellant argues that the trial court erred in disallowing expert testimony regarding certain experiments. The trial court, after extensive voir dire of the expert prior to testimony, refused to allow any testimony about the results of an experiment created by the expert to aid appellant's defense, i.e., child falling which resulted in her death.

■ It is well settled that experimental evidence is admissible when the experiment was made under conditions substantially similar in essential particulars to the conditions which prevailed at the time of the incident in controversy, and that the conditions need not be identical. *Kaesener v. Schnucks Markets, Inc.*, 498 S.W.2d 555, 557 (Mo.1973); *Lawson v. Schumacher & Blum Chevrolet, Inc.*, 687 S.W.2d 947, 954 (Mo.App.1985). Also, we recognize that admission of evidence of experiments is a matter within the sound judicial discretion of the trial judge. In this regard, judicial discretion should not be interfered with on appeal unless it has been manifestly abused. *Fowler v. S–H–S Motor Sales Corp.*, 560 S.W.2d 350, 356 (Mo.App.1977).

Another pertinent standard regarding experimental evidence is that the test be "generally acceptable to the scientific community." *State v. Pernell*, 606 S.W.2d 389, 392 (Mo.App.E.D.1979). Here, the expert, the originator of the experiment, conceded during voir dire that the technique was not generally accepted.

Q —this particular test that you have constructed in this case, as I understand it, is one of your originations. Is that correct?

A It is, sir. Yes.

Q And you did not borrow this ladder and bathroom scale test from someone else?

A It is original.

Q All right.

A To the best of my knowledge. I have never seen it in print.

Q And, to your knowledge the ladder—I am going to call it the ladder and bathroom scale test.

A Right.

Q All right. You have no information that shows that this is generally accepted in the field of dentistry as a method for determining cause of trauma to teeth?

A It must be like fingerprints in their origin, or like bite mark cases. There has to be a beginning.

Q It's the first case?

A I have never read of one. You might ask Dr. Gibb when he is on the stand. But, I have not read of one.

Q My question is, Doctor: How many times prior to your test had this particular type of equipment—

A Oh.

Q —been used in a similar experiment?

A I know of none. I know of none.

Q And, the ladder and scale test, to this point, this point to you, has not gained acceptance in the field of dentistry as a method for determining—

A    I'd like to bring up a subject that I have—

Q    Doctor, I don't want to be argumentative. But, I would like you to answer my question.

A    I don't know of a similar case.

It is clear from the testimony that the test did not meet "generally acceptable to the scientific community" standard as set forth in *Pernell.*

■   Additionally, there were numerous factual and technical differences between the experiment at issue and other evidence presented at trial. The teeth used in the experiment were not of the same age as that of the victim. The weight of the "head" used in the experiment was not equal to that of the victim, the force of the fall varied due to the difference in body weight between the victim and the experiment. The factual discrepancies and the expert's own testimony that the experiment was not "generally accepted," clearly lead to the conclusion that the trial court did not abuse its discretion in disallowing the admission of the experimental test.

■   In her fourth point, appellant contends that the trial court erred in not submitting MAI–CR 2.28, excusable homicide, to the jury and such refusal prejudiced appellant by depriving appellant of a viable defense supported by the evidence. The defense of excusable homicide is required to be submitted where *supported by the evidence.* (emphasis added) *State v. Rickey,* 658 S.W.2d 951, 954 (Mo.App.1983). An instruction patterned on MAI–CR 2.28 may properly be given only where it is supported by the evidence. The fundamental limitation upon the applicability of the instruction is contained in its opening paragraph. "By 'excusable homicide' is meant the killing of another by accident or misfortune under the circumstances submitted in this instruction." *Rickey* at 955.

■   Appellant contends that there is a sufficient amount of evidence in the record to require that an excusable homicide instruction be given. The state asserts that the evidence proffered by appellant as fac-

tually supporting the refused instruction, on closer inspection, does not support the instruction. We agree.

The evidence read in the light most favorable to the appellant, who submitted the instruction, does not raise the issue of the accidental death of the victim. The trial court did not err in not submitting to the jury MAI–CR 2.28. The trial court correctly instructed down on the question of manslaughter as prescribed by MAI–CR 15.16 when the actual indictment was for class A felony murder in the second degree under Section 565.004 RSMo 1978 (Page 15–6, MAI–CR).

The mere mention of the terms "shaking" and "whiplash" by state's witness, Dr. Mary Case, the medical examiner, does not suffice as evidence supporting an instruction for "excusable homicide" when read in the context of her testimony. Since there was no other medical testimony on the cause of death and its origin, the appellant relies on Dr. Case's testimony as evidentiary support for her defense.

In both her direct examination testimony and her cross examination testimony, state's witness, Dr. Mary Case, testifies regarding subdural hematomas. In direct examination Dr. Case stated:

The dura is separated from the brain by a space. We call it the subdural space.

And, beneath that space there was a large amount of blood. And, because it's beneath the dura it's referred to as subdural hemorrhage.

This is a type of hemorrhage that is caused by trauma. There was a very large collection of that. Most of it was on the left side, and some of it on the right side. It was very massive.

The brain itself was the site of brain death. At this time the brain had died because of the blood being added to the head, blood was no longer able to flow into the neck vein and arteries so that the—the head actually suffered from lack of oxygen and died.

This happened several hours before the child was actually pronounced. It's a condition of what we call brain death.

The brain itself did not show any injury in the way of bruises or lacerations.

That was the extent of the head injuries.

Q From that head injury do you have an opinion as to what the cause of death of this child was?

A The head injury was the cause of death, yes.

Q And, do you have an opinion to a reasonable degree of medical certainty as to what type of mechanism would cause that type of injury?

A Yes. This injury was the result of some kind of a very significant blunt trauma two or more times impacting the head.

By blunt, I mean it was not a gunshot wound, a stab wound, it was not a laceration that tore the scalp. It was something like a board, or being struck against a wall, or a hand could do it, a foot could do it, a shoe on a foot; anything of significant force striking several times upon the head in a very significant manner could produce injury of this type.

Dr. Case's explanation the cause of Latasha's death could not be understood as accidental.

During cross examination when Dr. Case discussed subdural hematoma she explained that there were various types of subdural hematomas, but she did not say that Latasha died from other types of subdural hematomas. Evidence of causation must be substantial for a verdict cannot rest on speculation or guesswork as to cause. *Hart v. City of Butler,* 393 S.W.2d 568 (Mo.1965). There is no mention of any causal connection between the specific type of subdural hematoma that caused Latasha's death and the fall or shaking mentioned in other parts of the testimony.

Throughout her testimony there is no claim by either party that Latasha died in any manner other than a subdural hematoma. Dr. Case clearly established in her testimony that there are numerous causes

of subdural hematomas, but that Latasha's death was caused by a blunt trauma subdural hematoma. The testimony offered in appellant's brief reflects comments made by Dr. Case regarding other causes of subdural hematomas. Nowhere in Dr. Case's testimony is the link made between Latasha's death and a subdural hematoma caused by a fall and/or shaking raised in appellant's testimony.

As there is no evidentiary connection between the type of subdural hematoma that caused Latasha Johnson's death and an accidental shaking and/or fall induced subdural hematoma that would support an instruction on excusable homicide, the trial court correctly refused appellant's excusable homicide instruction.

The appellant's fifth point of contention is that the trial court erred in overruling appellant's request to strike a venireman for cause when comments elicited from venireman during voir dire raised the question of the venireman's potential bias in favor of the state.

The law regarding juror selection is well established. A defendant in a criminal case is entitled to a full panel of qualified jurors before he is required to make his peremptory challenges. *State v. Smith,* 649 S.W.2d 417, 422 (Mo. banc 1983), *cert. denied,* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). The trial court has wide discretion in determining the qualifications of venirepersons and its ruling on a challenge for cause will not be disturbed in the absence of a clear and certain abuse of that discretion. *State v. Morris,* 680 S.W.2d 315, 319 (Mo.App.1984). The trial judge is in a far better position to make a determination as to the qualifications of a potential juror than an appellate court, as that determination necessarily involves a judgment of the demeanor of the venireperson. *State v. Royal,* 610 S.W.2d 946, 950 (Mo. banc 1981). Any doubt as to the propriety of the trial judge's ruling should be resolved in his favor. *State v. Daniels,* 629 S.W.2d 627, 630 (Mo.App.1982).

Appellant claims that venireman indicated a bias in favor of state's witness Dr. James Kinder. During the state's voir dire examination, the venireman made it clear that his relationship with Dr. Kinder would not effect his deliberation. The prosecutor specifically asked about his relationship with Dr. Kinder, and the following exchange resulted:

PROSECUTOR: And, Mr. McFerron, do you know Dr. Kinder?

VENIREMAN: Yes. I have known Dr. Kinder almost all my life.

PROSECUTOR: On a social basis?

VENIREMAN: Well, no, personally, I mean, from high school and—was my son's doctor when he was younger.

PROSECUTOR: Would that—would your relationship with him be so close that you could not hear his testimony and weigh it like you would anyone else's?

VENIREMAN: *No.* Our relationship is not really that close. (emphasis added).

Shortly afterward, appellant's counsel again addressed the venireman.

DEFENSE COUNSEL: You have indicated that you've known Dr. Kinder all of your life, that he's your son's doctor. Same question to you. Will he have a 'leg up' coming in here as a witness today?

VENIREMAN: Well, I have to respect his profession.

DEFENSE COUNSEL: Okay, do you feel that because a doctor occupies a high pedestal in our society, can you listen to them as any other witness, determine what they said, evaluate it, and make a decision as to whether it's believable or not?

VENIREMAN: I think I would tend to believe him.

DEFENSE COUNSEL: Because of their position alone?

VENIREMAN: Partly because of that, yes.

DEFENSE COUNSEL: This relationship that you have with Dr. Kinder, would that cause him—him personally, not just physician in general, to have a 'leg up,' that I am speaking of, that when he gets there, he is not equal, he is a little bit better than somebody else coming in?

VENIREMAN: I hope not.

The trial court proceeded to clarify the venireman's response by asking the following questions.

THE COURT: Thank you Mr. Robbins [defense counsel]. In order to clarify the record and to help me in certain issues, I will have to decide—I feel compelled to bring up an issue that has been described by the state as your ability to hear the testimony and described by the defendant as 'having a leg up'. Now, some of you have described a relationships with certain witnesses that may or may not appear in this trial. I will read to you an instruction that will be read to you if you are selected as a juror and those of you who claim some relationship with these witnesses, please tell me; first, can you follow this instruction? Second, can you set aside whatever relationship you have with the witness and determine the credibility of the witness based only upon those factors? Listen carefully. Here is the instruction: "In determining the believability of a witness and the weight to be given to the testimony of the witness you may take into consideration the witness's manner while testifying, the ability and opportunity of the witness to observe and remember any matter about which testimony is given. Any interest, bias or prejudice the witness may have. The reasonableness of the witness's testimony considered in the light of all of the evidence in the case and any other matter that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness." Is there anyone who did not understand my two-part question? Is there anyone who would like to respond to the question? If you recall, the question is; can you set aside the relationships you have described with these witnesses and can you judge the credibility of those witnesses with whom

you have had that relationship and consider only those facts which I have just read to you? Let's take the first part first. Those of you who have had relationships with other witnesses, I don't like to use that word, those of you who know other witnesses who may or may not appear, can you set that aside and judge the credibility only on the facts that I have mentioned to you? Mr. McFerron?

VENIREMAN: Yes, Sir, I think so.

At the conclusion of voir dire, appellant's counsel moved to strike venireman for cause. The court overruled the request.

█ Standing alone, friendship with a witness is insufficient to disqualify a venireperson. *State v. Williams*, 650 S.W.2d 642, 643 (Mo.App.1983). Rather, the venireperson must demonstrate an actual bias against the interest of the litigant. *State v. Owens*, 620 S.W.2d 448, 449–450 (Mo. App.1981). The present case is similar to that of *State v. Miller*, 655 S.W.2d 797 (Mo.App.1983).

█ In *Miller*, a venireperson stated that a police officer's testimony might be more worthy of belief than lay witness, but did not state that he could not be fair or impartial. *Id.* at 799. The *Miller* court found that it was not an error to refuse to strike such a venireperson for cause. In the present case, venireman indicated that his relationship with Dr. Kinder would not effect his deliberation. While he did state that he respected Dr. Kinder's profession, he also stated that he hoped he would not consider his testimony more highly. When the court reiterated the jury instruction concerning the credibility of witnesses, the venireman stated that he could follow the instruction.

Cases cited by appellant are not dispositive as they can be distinguished by the factual dissimilarities from the present situation. We find no abuse of the trial court's discretion.

Judgment affirmed.

KAROHL, P.J., and GARY M. GAERTNER, J., concur.