Cobie SHINUALD, Appellant,

v.

MOUND CITY YELLOW CAB COMPANY, Respondent.

No. 46588.

Missouri Court of Appeals,
Eastern District,
Division Three.

Jan. 24, 1984.

Motion For Rehearing and/or Transfer to Supreme Court Denied March 8, 1984.

Application to Transfer Denied April 16, 1984.

Harry James Nichols, St. Louis, for appellant.

Mark Robert Henry, Clayton, for respondent.

CRANDALL, Judge.

In August 1976, appellant Cobie Shinuald, then a Yellow Cab driver, was driving passengers to the St. Louis train station when his cab was demolished by a city bus.

The Labor and Industrial Relations Commission (Commission) affirmed a consequent workers' compensation award to Shinuald for injuries he sustained in the accident. The named employer, Mound City Yellow Cab Company (Yellow Cab), appealed the award to the circuit court and the circuit court reversed, concluding that claimant was not Yellow Cab's employee but an independent contractor. The correctness of that ruling is the sole issue on this appeal. We reverse and remand with directions to affirm the award of the Commission.

■ Section 287.020.–1., RSMo (1978)[1] defines "employee" for the purposes of The Workers' Compensation Law. The pertinent part of the definition is set out below:

> The word 'employee' as used in this chapter shall be construed to mean every person in the service of any employer, as defined in this chapter, under any contract of hire, express or implied, oral or written, or under any appointment or election, including executive officers of corporations.

\*   \*   \*   \*   \*   \*

As the definition implies, an employer-employee relationship under The Workers' Compensation Law is established by proof of two ultimate facts: " 'one, that the claimant was in the service of the [alleged employer], and, two, that said services were controllable' by the latter." *Lawson v. Lawson*, 415 S.W.2d 313, 319 (Mo.App. 1967). The Commission held that the requisite controllable services were shown when the evidence was viewed under the "relative nature of the work test" approved in *Ceradsky v. Mid-America Dairymen, Inc.*, 583 S.W.2d 193 (Mo.App.1979); i.e., by looking at

> the character of the claimant's work or business—how skilled it is, how much of a separate calling or enterprise it is, to what extent it may be expected to carry its own accident burden and so on—and its relation to the employer's business, that is, how much it is a regular part of the employer's regular work, whether it is continuous or intermittent, and wheth-

1. All further statutory references are to RSMo (1978), which controlled this case below.

er the duration is sufficient to amount to the hiring of continuing services as distinguished from contracting for the completion of a particular job.

*Id.* at 199; and *see* 1C A. Larson, *The Law of Workmen's Compensation* § 43.52, at 8–20 (1980). We agree.

■ We view the evidence before the Commission in the light most favorable to the award, indulging all reasonable inferences therefrom that favor the award. *Schultz v. Moerschel Products Co.,* 142 S.W.2d 106, 109 (Mo.App.1940); *and see Stegeman v. St. Francis Xavier Parish,* 611 S.W.2d 204, 205 (Mo.banc 1981).

Yellow Cab is a corporation with offices in St. Louis. According to its president, it is franchised to "just operate generally a taxicab business." The business consists principally. of a garage (where cabs are maintained, repaired, painted, etc.), a retail gasoline business, a radio-dispatching operation, and of course the cabs themselves, seventy percent of which are company-owned and which service the sixty-odd cabstands that have been assigned to and which are maintained by Yellow Cab throughout its service area. Service is confined mainly to the City of St. Louis, the unincorporated areas of St. Louis County, and to those municipalities in St. Louis County that have licensed Yellow Cab to operate within their respective city limits. Service to distant destinations outside the principal service area requires Yellow Cab's prior approval.

Claimant started as a cabdriver in April, 1975, by driving a company-owned cab, having gone through the usual application process. He completed a written Yellow Cab application form at Yellow Cab's office, passed the required physical examination, obtained a "cab driver's license," and had a favorable report when Yellow Cab checked for a police record. He then completed a two-or three-day training period, which consisted of riding with another Yellow Cab driver to learn "how it goes."

Company-owned cabs and driver-owned cabs operate generally in the same way. On-duty drivers must conform to Yellow Cab's dress code by being clean-shaven (though mustaches were allowed), and by wearing a white shirt and a "yellow cab cap" at all times. Non-conforming drivers get no calls from the Yellow Cab dispatcher (ninety percent of a driver's fares result from responding to calls from the dispatcher on the cab's two-way radio) and persistent offenders soon find they no longer drive a yellow cab. Cabs are required to be fueled at Yellow Cab's pumps, and then are driven to a Yellow Cab cabstand to await either a call from the Yellow Cab dispatcher or, less frequently, a "walk-out" fare to cabstands at certain restaurants, hotels and transportation depots.

Yellow Cab set the rates for all fares, though under its agreement with each cabdriver, the driver kept all fares paid and made a periodic "stand dues" payment to Yellow Cab. Those driving company-owned cabs paid about $20 daily as "stand dues," and those operating driver-owned cabs paid about $350 monthly. Part of each driver-owner's payment went for operating costs, such as Yellow Cab's charges for the installation and use of the two-way radio and meter, installment payments of liability insurance premiums (Yellow Cab selects the insurance company and the coverage, and also handles all paperwork connected with accidents and claims), the driver's monthly union dues, fees for automobile safety inspections (which Yellow Cab arranged), and monthly "city stickers" for the cabs (which Yellow Cab obtains for the drivers). All other operating expenses not paid through the assessment of stand dues were paid by the drivers directly.

In May 1975, claimant purchased a cab from another Yellow Cab driver and thus joined the thirty percent of Yellow Cab drivers who own their own cab. Yellow Cab reassured claimant that the cab satisfied company requirements and that he could "put it on the stand"—i.e., the car was not more than three years old and was the proper make and model; it had been painted the required shade of yellow and had all the required decals; and all the required fixtures and equipment had been installed (e.g., the two-way radio and speakers, meter, and the lighted dome-top fixture). Except for a month in 1975 when

claimant's cab was being repaired, he drove it seven days a week every week for ten to twelve hours a day or until he grossed $100, yielding him a net income of $280 per week.

 Yellow Cab, with an eye on the common law test for the relation of master and servant, emphasizes evidence purportedly showing that it lacked control or the right to control claimant's daily operation of his cab. That evidence is to the effect that claimant could start and stop work when he pleased (or not work at all if he so chose), go where he pleased within the Yellow Cab service area, and that claimant was not compelled to respond to any dispatcher calls or account to Yellow Cab for the fares he received. However, even under the common law test "the right to control ... need only be commensurate with the supervision appropriate to the kind of work to be done and the skill required to do it." *Ceradsky v. Mid-America Dairymen, Inc.*, 583 S.W.2d at 203. The evidence we recounted earlier certainly does not show that claimant was an autonomous cabdriver nor is the evidence of autonomy that Yellow Cab recites inconsistent with the existence of an employer-employee relationship in running a taxicab business.

 Equally important is the evidence that claimant was in Yellow Cab's service. To quote the Commission: "It is a business of the Mound City Yellow Cab Company to supply taxicab service to the customers ...." There is substantial evidence that claimant's work was a regular and continuous part of that business and not an independent business through which it would be feasible to channel the cost of work-connected injury. *Ceradsky v. Mid-American Dairymen, Inc.*, 583 S.W.2d at 201. Therefore, claimant is *a fortiori* an "employee" for the purposes of The Workers' Compensation Law.

 Finally, Yellow Cab contends it is not an employer within the meaning of

**2.** Section 287.030.–1.(1) provides:
The word 'employer' as used in this chapter shall be construed to mean:
(1) Every person, partnership, association, corporation, trustee, receiver, the legal repre-

§ 287.030.–1.(1) because at no time did it pay claimant for any service.[2] It is true that claimant never received a Yellow Cab paycheck, but that is so only because Yellow Cab's agreements with its drivers permits it to employ an ingenious alternative in fixing their compensation. That claimant was an employee engaged in work covered by The Workers' Compensation Act, we think is clear; and we decline to permit the reality of that status to be obscured by formalities attending the employee's remuneration. *See e.g., Pruitt v. Harker*, 328 Mo. 1200, 43 S.W.2d 769, 772 (Mo.1931); *Lawson v. Lawson*, 415 S.W.2d at 318, 319.

The judgment of the circuit court is reversed, and we remand this cause with directions to affirm the award of the Labor and Industrial Relations Commission.

KAROHL, P.J., and REINHARD, J., concur.

sentative of a deceased employer, and every other person, including any person or corporation operating a railroad and any public service corporation, using the service of another for pay; ....