AETNA CASUALTY & SURETY COMPANY and Standard Fire Insurance Company, Plaintiffs–Appellants,

v.

Gwenn K. PAVLOVITZ, M.D., St. Louis Children's Hospital, Barnes Hospital, Jewish Hospital of St. Louis, Washington University, Alan Murphey, by and through his Next Friend John Murphey, John Murphey and Anne Murphey, Defendants–Respondents.

No. 60292.

Missouri Court of Appeals, Eastern District, Division Two.

March 17, 1992.

Hinshaw & Culbertson, Terese A. Drew, Bruce L. Carmen, David H. Levitt, Chicago, Ill., for plaintiffs-appellants.

Sandberg, Phoenix & von Gontard, P.C., John S. Sandberg, Paul M. Rauschenbach, St. Louis, for defendants-respondents St. Louis Children's Hosp. and Gwenn K. Pavlovitz, M.D.

Armstrong, Teasdale, Schlafly & Davis, Steven P. Sanders, St. Louis, for defendant-respondent Barnes Hosp.

CRANDALL, Presiding Judge.

Alan Murphey, by and through his next friend John Murphey, John Murphey and Anne Murphey brought an action for medical malpractice against Gwenn K. Pavlovitz, M.D., St. Louis Children's Hospital, Barnes Hospital, Jewish Hospital of St. Louis, and Washington University. St. Louis Children's Hospital as well as Aetna Casualty and Surety Company and Standard Fire Insurance Company brought separate declaratory judgment actions with regard to their rights and duties under certain liability insurance policies which had been issued to St. Louis Children's Hospital. The trial court consolidated the declaratory judgment actions; and, in a court-tried case, declared that the policies of insurance did provide coverage for Dr. Pavlovitz against the claims asserted in the underlying medical malpractice action. Aetna Casualty and Surety Company and Standard Fire Insurance Company appeal from that judgment. We affirm.

The evidence adduced at trial established that, at all times pertinent to the underlying malpractice action, St. Louis Children's Hospital (Children's) was part of the Washington University Medical Center (Medical Center) which was comprised of Washington University School of Medicine (Medical School) and two other hospitals, Barnes Hospital (Barnes) and Jewish Hospital of St. Louis (Jewish). The three hospitals were teaching institutions and they employed interns and residents, who were licensed physicians undergoing training in specialized areas of medicine. The hospitals called these specialized areas of medicine "services" and interns and residents

received training for a specific time period within these services. The hospitals used the term "house officers" when referring to interns and residents. Each of the three hospitals appointed its own house officers. House officers usually received training within the services offered by the respective hospitals; but they sometimes worked "on rotation" to a particular service at another Medical Center hospital, especially when the hospital which had appointed them did not offer that service. The hospital which had appointed the house officers paid them, but was reimbursed by the other Medical Center hospital while they were working on rotation. House officers followed the rules and regulations of the particular hospital at which they were working. The service in which house officers were on rotation established their work schedules. Full-time faculty members of the Medical School supervised house officers and had the authority to terminate their employment with the hospitals.

At the time of the occurrence in question, Dr. Pavlovitz was a second year general surgery resident appointed by Jewish, who was on rotation to Barnes in the cardiothoracic surgery service. Jewish did not have a cardiothoracic surgery service; and training in that service for a specific period of time was a requirement for a general surgery resident. Children's also did not have a cardiothoracic surgery service, so cardiac surgery was performed at Barnes and residents on rotation at Barnes treated patients of Children's during and after surgery at Barnes and during postoperative recovery at Children's. If there was a cardiothoracic surgery patient at Children's, Dr. Pavlovitz and a team of house officers in that service checked the patient on a daily basis. Dr. Pavlovitz also was scheduled to be "on call" at Barnes and at Children's every third night. Dr. Pavlovitz worked directly under Dr. James Kelly,[1] chief cardiothoracic surgery resident at

Barnes. Dr. Pavlovitz and Dr. Kelly were supervised by Dr. Clarence Weldon, a full-time faculty member and head of the cardiothoracic surgery department at the Medical School and Chief of Cardiothoracic Surgery at Barnes, Children's, and Jewish.

In August 1981, Alan Murphey was a patient at Children's. Following cardiac surgery at Barnes, he was returned for postoperative care to Children's where he began to experience complications. Because Dr. Pavlovitz was on call, she treated Alan Murphey at Children's, where he allegedly suffered the injuries which formed the basis of the underlying medical malpractice action.

At the time of the alleged injury, Children's was insured by Aetna Casualty and Surety Company (Aetna) under the terms of a hospital professional liability policy and a comprehensive general liability policy and by Standard Fire Insurance Company [2] under an excess indemnity (umbrella) policy. In the process of procuring insurance coverage from Aetna in the fall of 1980, Children's contacted its broker, Alexander and Alexander (A & A). Children's submitted to A & A, and A & A in turn submitted to Aetna, a formal application for insurance. On this application, under the section termed "Employees," Children's listed the interns and residents whose total work hours were expressed in terms of 106 "full-time equivalents." In addition, Children's provided A & A and Aetna with a three page document titled "Intern and Resident Coverage" which described Children's house staff and stated that two house officers from Barnes in cardiothoracic surgery spent one-third of their time at Children's. On the basis of this information, Aetna declined to make a quote on the insurance because of what they viewed as unusual exposure resulting from the house officers who worked on rotation at Children's. At the request of Aetna, Children's

---

1. Based on the record before it, the trial court dismissed all claims for declaratory relief concerning Dr. Kelly because the record did not show that he was a party either to this action or to the underlying malpractice action.

2. Standard Fire Insurance Company has not conducted an appeal separate from Aetna's. If coverage is afforded Dr. Pavlovitz under the hospital liability policy, her coverage under the umbrella policy is conceded. For these reasons, we hereinafter refer to the insurance companies jointly as "Aetna."

furnished a letter of intent written to Barnes describing the indemnity agreement between Children's and Barnes as to the rotating residents. The text of the letter provided as follows:

This letter is to serve as a letter of understanding of house staff indemnification for those house staff officers on rotation from either institution.

If an incident arises in St. Louis Children's Hospital out of which a claim is made against a resident appointed by Barnes Hospital who is serving as a resident on rotation to St. Louis Children's Hospital, St. Louis Children's Hospital will defend and indemnify that resident as if he were appointed by St. Louis Children's Hospital and serving in St. Louis Children's Hospital.

If an incident occurs in Barnes Hospital out of which a claim is made against a resident appointed by St. Louis Children's Hospital who is serving as a resident on rotation to Barnes Hospital, Barnes Hospital will defend and indemnify that resident as if he were appointed by Barnes Hospital and serving as a resident in Barnes Hospital.

This letter merely memorialized an agreement between the three Medical Center hospitals, which had been in existence since 1976 and which had provided that the hospital responsible for defending a house officer against medical malpractice was the hospital in which the conduct constituting the alleged malpractice had occurred.

Aetna's underwriter added an endorsement to the hospital professional liability policy to cover the rotating house officers, which read in relevant part:

### ADDITIONAL INSURED

### (EMPLOYEES OF NAMED INSURED)

It is agreed the following additional provisions apply:

1. PERSONS INSURED. The "Persons Insured" provision is amended to include as an *Insured* any employee of the *Named Insured:*

(a) while acting within the scope of his or her duties, as such; or

(b) who renders or performs a *Good Samaritan Act* away from the premises of the *Named Insured:*

provided that no employed physician or surgeon shall be an Insured unless (i) he or she is listed as a "Designated Employed Physician or Surgeon", (ii) he or she commences employment by the Named Insured during the term of this policy and the Company is notified by the Named Insured of his or her employment within 30 days after the commencement of such employment, or (iii) he or she is employed by the Named Insured as an intern or resident.

\*　　\*　　\*　　\*　　\*　　\*

*Designated Employed Physician or Surgeon*

As on file with the company

As a result of the coverage provided for rotating house officers in the above-quoted endorsement, Aetna increased the premium for Children's insurance by ten percent. Aetna interpreted the endorsement language "[a]s on file with the company" as referring to the three documents which it retained in its underwriting file and which were mentioned above; namely, the written description of the rotating house officer program, the letter of intent from Children's to Barnes, and the application of Children's for liability insurance. Aetna never informed Children's that it did not intend to insure house officers when they were on rotation to Children's. Contrary to Aetna's own underwriting guidelines in existence at that time, Aetna did not request that Children's identify the employed physicians by name.

When the malpractice action was brought against Dr. Pavlovitz and the three Medical Center hospitals, Aetna responded that it did not consider Dr. Pavlovitz an employee of Children's but rather viewed her as being on rotation to Barnes. Aetna agreed to defend her only under a reservation of rights letter. Children's brought a declaratory judgment action in which it sought a declaration of the rights and obligations of the parties with regard to Children's and Dr. Pavlovitz under the

three policies issued by Aetna; namely, the hospital profession liability policy, the comprehensive general liability policy, and the excess indemnity (umbrella) policy. Aetna then brought a declaratory judgment action of its own, seeking a determination that they were not obligated under the policies issued to Children's to provide coverage to Dr. Pavlovitz in connection with the malpractice action; and that, in the event Children's indemnified Dr. Pavlovitz, such indemnification was not covered by the policies. The trial court consolidated both actions for trial.

After an evidentiary hearing, the trial court entered judgment finding, *inter alia,* that Dr. Pavlovitz was an employee of Children's and was therefore covered under the hospital professional liability policy, by virtue of the endorsement contained therein. The court also found that Dr. Pavlovitz was on rotation to Children's; and based upon Children's contractual agreement with Barnes, Aetna was obligated, under the comprehensive general liability policy, to indemnify Dr. Pavlovitz.

Our review of a court-tried case is guided by the principles enunciated in the oft-cited *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). Although Aetna raises several points on appeal, the relevant inquiry can be condensed into a two-pronged analysis: whether Dr. Pavlovitz was an employee of Children's; and, if she was an employee, whether she was covered under the insurance policies issued by Aetna to Children's.

█ We first consider whether Dr. Pavlovitz was an employee of Children's. With regard to determining employee status, it is a well settled rule that words in insurance policies must be given their plain and ordinary meaning. *Knob Noster v. Casualty Indem. Exch.,* 769 S.W.2d 842, 843 (Mo.App.1989). Given that the term "employee" has a common meaning, the determination of whether an individual falls within that classification turns on an analysis of the facts of a particular case. *Id.; Sisters of St. Mary v. Blair,* 730 S.W.2d 614 (Mo.App.1987).

█ The question of the existence of an employer-employee relationship typically focuses on the dichotomy between an employee and an independent contractor. *See Jokisch v. Life and Casualty Ins. Co. of Tenn.,* 424 S.W.2d 111 (Mo.App.1967). This question most often arises in the context of a workers' compensation claim. *See Shinuald v. Mound City Yellow Cab Co.,* 666 S.W.2d 846 (Mo.App.1984). Although a workers' compensation claim is inapposite to the one before us, the factual analysis used to determine whether a claimant is an employee is instructive and affords a framework within which we can analyze the facts of the case before us. Under Workers' Compensation Law, an employer-employee relationship is established by proof of two ultimate facts: (1) that the claimant was in the service of the alleged employer; and (2) that such services were controllable by the alleged employer. *Hill v. 24th Judicial Circuit,* 765 S.W.2d 329, 331 (Mo.App.1989) (citing *Shinuald,* 666 S.W.2d at 847). The right to control need only be commensurate with the supervision appropriate to the kind of work done and the skill required to do it. *Shinuald,* 666 S.W.2d at 847–878.

█ In the instant action, the injury which allegedly formed the basis of the underlying malpractice action occurred at Children's while Dr. Pavlovitz was treating a patient. Dr. Pavlovitz was a second year surgery resident appointed by Jewish, but receiving training in the cardiothoracic surgery service at Barnes. Dr. Pavlovitz was on rotation at Barnes because her residency program required her to be trained in cardiothoracic surgery and because Jewish did not have such a service. As part of her training at Barnes, Dr. Pavlovitz was required to treat cardiothoracic patients of Children's either at Children's or at Barnes. If she were treating a patient of Children's, she was periodically "on call" to Children's in case an emergency arose. Her work schedule reflected her rotation at Children's. Dr. Pavlovitz was under the control and supervision of Dr. Kelly, who was the chief resident in cardiothoracic surgery at Barnes, as well as Dr. Weldon, who was chief of cardiothoracic surgery both at Barnes and at Children's. Had Dr. Pavlo-

vitz's performance of her duties been less than satisfactory, Dr. Weldon had the authority to terminate her employment. Dr. Pavlovitz was paid indirectly by Children's because Children's reimbursed Barnes for the time on which Dr. Pavlovitz was on rotation at Children's. Dr. Pavlovitz was therefore in the service of Children's and her services were controlled by Children's. The evidence supports the trial court's determination that Dr. Pavlovitz was an employee of Children's.

The second prong of our two-part analysis is whether Dr. Pavlovitz was covered under the terms of the liability insurance policies which Aetna issued to Children's. The endorsement to the hospital professional liability policy, which was set forth previously in this opinion, described "PERSONS INSURED" as those employed physicians who were listed as a "Designated Employed Physician or Surgeon" and who were "on file with the Company." The documents "on file" with Aetna consisted of the documents in Aetna's underwriting file: a three-page written description of the rotating house officer program, the letter of intent from Children's to Barnes, and the application of Children's to Aetna for liability insurance. These documents were incorporated into the insurance contract by reference and were as much a part of the contract as if they had been set out in the contract. *See Jim Carlson Constr., Inc. v. Bailey,* 769 S.W.2d 480, 481 (Mo.App.1989). One of the three pages which described the house officer rotation program specifically stated that two cardiothoracic surgery house officers from Barnes spent one-third of their time at Children's. The documents on file with Aetna were sufficient to inform Aetna that a house officer from Barnes would be serving cardiothoracic surgery patients at Children's and would be doing so on a part-time basis. Aetna was aware of the rotation program for house officers in effect between Barnes and Children's. At no time did Aetna notify Children's that it did not intend to insure the house officers on rotation at Children's. Aetna even failed to follow its own requirement that house officers be identified by name. We note that by failing to name the designated physicians and surgeons, Aetna waived its own requirement that those employees be specified by name. Aetna issued the insurance without more information being required under the designated physician section than the mere phrase "[a]s on file with the company." Although Aetna did not specifically designate Dr. Pavlovitz as such by name, Aetna was aware that there was a physician serving on rotation at Children's in the cardiothoracic surgery service. Under the terms of the endorsement to the hospital professional liability policy, a physician in that capacity was employed by Children's. The trial court did not err in holding that Dr. Pavlovitz was a designated employed physician or surgeon under the terms of the hospital professional liability policy, such that she was entitled to coverage under the policy endorsement.

The judgment of the trial court is affirmed.

SIMON and AHRENS, JJ., concur.