**Linda WILMOT, Widow, and Christine, Jerome and Daniel Wilmot, Dependents of Thomas A. Wilmot, Deceased, Respondents,**

v.

**Kathryn BULMAN, d/b/a Exterior Design, Employer–Appellant,**

and

**Missouri State Treasurer, Custodian of the Second Injury Fund, Appellant.**

**Nos. 19973, 19953.**

Missouri Court of Appeals, Southern District, Division One.

Sept. 27, 1995.

---

Joe W. Coleman, Mark S. Gunnison, McDowell, Rice & Smith, P.C., Kansas City, for Kathryn Bulman, employer–appellant.

Terry J. Brady, Jeffrey M. Pfaff, Gage & Tucker, L.C., Kansas City, for appellant, Mo. State Treasurer, Custodian of the Second Injury Fund.

Frank Eppright, Eppright and Schoeppey, Kansas City, Elizabeth Diane Baker, Connaughton, Boyd & Kenter, P.C., Kansas City, for respondents.

MONTGOMERY, Presiding Judge.

Kathryn Bulman (Bulman) and the Missouri State Treasurer, Custodian of the Second Injury Fund (SIF), both appeal a workers' compensation award to the surviving spouse and minor dependents of Thomas A. Wilmot, deceased. Mr. Wilmot was a siding applicator and became associated with Exterior Design, Inc. (EDI) in 1986. He died on November 10, 1988, when he fell from a roof while installing vinyl siding on a home in Rolla, Missouri.

A majority of the Labor and Industrial Relations Commission (Commission) found that Mr. Wilmot died as a result of an accidental injury which arose out of and in the course and scope of his employment with EDI. The Commission also found Bulman personally liable, along with EDI, as an employer because of her attempts "to hide under the corporate cloak to perpetrate a fraud." Because EDI was uninsured, the Commission found SIF liable to claimants under § 287.220 [1] for weekly benefits and funeral expenses.

In her appeal, Bulman contends that the record lacks sufficient competent evidence to warrant piercing the corporate veil of EDI and holding her personally liable. SIF's appeal claims that (1) Mr. Wilmot was an inde-

pendent contractor, not an employee as found by the Commission, and (2) the evidence does not support the award of weekly benefits to the claimants because § 287.220.5 only imposes liability on SIF for "fair, reasonable and necessary expenses in the manner required in Sections 287.240 and 287.241."

Appellate review of the Commission's award is governed by § 287.495, RSMo 1994, which reads, in pertinent part:

> [I]n the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
>
> (1) That the commission acted without or in excess of its powers;
>
> (2) That the award was procured by fraud;
>
> (3) That the facts found by the commission do not support the award;
>
> (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

In *Alexander v. D.L. Sitton Motor Lines,* 851 S.W.2d 525, 527 (Mo. banc 1993), the court said:

> Under *Article V, § 18,* of the Missouri Constitution we review the decision of the Commission to see that it is supported by competent and substantial evidence on the record as a whole. In that review, we defer to the Commission on issues involving the credibility of witnesses and the weight to be given testimony, and we acknowledge that the Commission may decide a case "upon its disbelief of uncontradicted and unimpeached testimony." Questions of law, of course, are the proper subject of our review. *Section 287.495.1, RSMo 1986.* (Citation omitted).

■ The award of the Commission may be overturned by this court only if it is not supported by substantial evidence or if it is clearly contrary to the overwhelming weight

---

1. Statutory references are to RSMo Supp.1992 unless otherwise indicated.

142

of the evidence. This court, viewing the record in the light most favorable to the findings of the Commission, must determine whether the Commission could have reasonably made its findings and award. *Johnson v. City of Duenweg Fire Dep't,* 735 S.W.2d 364, 366 (Mo. banc 1987).

### SIF'S APPEAL

SIF first claims that the evidence fails to support the conclusion that Mr. Wilmot was an employee rather than an independent contractor. The injured person's employment status in a workers' compensation case usually involves a question of law which this Court may correct within our province of review. *Miller v. Hirschbach Motor Lines, Inc.,* 714 S.W.2d 652, 654–55 (Mo.App.1986). The facts of each case control whether the claimant is an employee or an independent contractor. *Gaston v. J.H. Ware Trucking, Inc.,* 849 S.W.2d 70, 73 (Mo. App.1993).

Here, Mr. Wilmot worked exclusively for EDI as a siding applicator for almost three years. Robert Koss, a co-worker with Mr. Wilmot, testified that EDI would terminate an applicator for "moonlighting" with a competitor. While Koss worked with Mr. Wilmot, EDI worked approximately eight siding crews which contained two or more persons per crew.

EDI gave Mr. Wilmot a work order for each job. He was paid upon completion of the job according to the square footage involved. Applicators, like Mr. Wilmot, were not paid hourly, punched no time clock, received no vacation, no holiday pay, and no health insurance benefits.

Mr. Wilmot used his own vehicle to transport materials to and from the job site and generally furnished his own tools. Generally, he set his own work hours after consulting with EDI's customer. An EDI representative occasionally visited the job site but did not supervise Mr. Wilmot's work. EDI was mainly concerned about a job satisfactory to the customer, not the method of application.

For two years before his death, Mr. Wilmot filed tax returns which reported the income from EDI as a profit or loss from his business and took deductions for truck expense, travel, small tools and protective clothing.

The workers' compensation law, § 287.020.1, at the time in question, defined "employee" as "every person in the service of any employer ... under any contract of hire, express or implied, oral or written, or under any appointment or election...." The term "independent contractor" has no statutory definition. However, the following judicial definition is generally accepted:

> "An 'independent contractor' is one who, exercising an independent employment, contracts to do a piece of work according to his own methods, without being subject to the control of his employer, except as to the result of his work."

*Miller,* 714 S.W.2d at 656 (citing *Vaseleou v. St. Louis Realty & Sec. Co.,* 344 Mo. 1121, 1126, 130 S.W.2d 538, 539 (1939)).

When the instant facts are viewed in light of these two definitions, no obvious outcome emerges. Arguably, as SIF contends, Mr. Wilmot could be viewed as an independent contractor because he generally performed each siding job according to his own methods, used his own tools, set his own hours, received payment by the job and was subject to little or no supervision. EDI was clearly most interested in the final result, i.e., a siding job satisfactory to the customer.

An Eastern District case, *Cole v. Town & Country Exteriors,* 837 S.W.2d 580 (Mo.App. 1992), determined that the siding applicator there was an independent contractor because "claimant's group had full control over the installation and completed the installation at their own pace." *Id.* at 584. *Cole* has many facts in common with the instant case. However, *Cole* factually differs from the case before us in that Mr. Wilmot worked continuously and exclusively for EDI. In *Cole,* the independent contractor operated a firm that specialized in siding installation and performed jobs for various siding sales firms. For at least that reason, control or the lack thereof is not so obvious here as it was in *Cole.* Therefore, we conclude that our decision in this case is controlled by *Ceradsky v. Mid–America Dairymen, Inc.,* 583 S.W.2d 193 (Mo.App.1979).

*Ceradsky* held that when the evidence fails to clearly demonstrate the element of control in the work relationship, the "relative nature of the work test" determines employment status for purposes of workmen's compensation. *Id.* at 199.

> Where by the very nature of the work relationship or other circumstance . . . control is not conspicuous, the right to direct the detail of the work becomes only one indicium of control among others and the inquiry turns to the economic and functional relationship between the nature of the work and the operation of the business served. The inquiry, moreover, tends away from technical common law definitions to the public purpose of the scheme for workmen's compensation.

*Id.* at 198–99.

The purpose behind the workers' compensation law is addressed in *Gaston, supra.*

> The purpose of workers' compensation is to make industry bear the burden of compensating employees for injuries arising out of the scope and course of employment. *West v. Posten Constr. Co.,* 804 S.W.2d 743, 746 (Mo. banc 1991). The fundamental purpose of the law is to put on the industry the losses sustained by employees arising out of and in the course of employment. *Wolfgeher v. Wagner Cartage Serv., Inc.,* 646 S.W.2d 781 (Mo. banc 1983). In addition, "the law is to be broadly and liberally interpreted . . . and is intended to extend its benefits to the largest possible class . . . any doubt as to the right of an employee to compensation should be resolved in favor of the injured employee." *West,* 804 S.W.2d at 746.

849 S.W.2d at 74.

■ Application of the nature of the work test requires consideration of these factors: (1) the character of the claimant's work or business—how skilled it is, (2) how much of a separate calling or enterprise it is, (3) to what extent it may be expected to carry its own accident burden and (4) its relation to the employer's business, that is, how much it

is continuous or intermittent, and whether the duration is sufficient to amount to the hiring of continuing services as distinguished from contracting for the completion of a particular job. *Ceradsky,* 583 S.W.2d at 199.

The *Gaston* court applied *Ceradsky's* "relative nature of the work" test and concluded that Gaston, a truck driver, was an employee of Ware, a trucking company, for workers' compensation purposes. Gaston drove his own truck for Ware under a lease which identified Gaston as an independent contractor. Under the lease, Gaston was responsible for all truck maintenance, he was required to work only for Ware or its designees, and either party could cancel the lease by giving 30 days' notice. Gaston could decline to haul loads if he so desired. Gaston was paid on a commission basis and paid his own expenses on the road. Ware deducted no taxes from Gaston's commission and furnished no health insurance for him.

Gaston had to call Ware's dispatchers for directions on the pickup and delivery of loads and to inform Ware of his daily location. Gaston's truck had "J.H. Ware, Inc." painted on its side. For fourteen years prior to his accident, Gaston worked only for Ware.

The *Gaston* court, in considering the factors under the nature of work test, found it significant that:

(1) Although truck drivers require a degree of skill, Gaston did not use his skill as a separate enterprise because he continuously worked for Ware for fourteen years. 849 S.W.2d at 74.

(2) The work Gaston did for Ware did not differ from the work done by Ware's regular employees. *Id.*[2]

(3) Gaston could not pass the cost of insurance on to his customers because he only worked for Ware, and society, in accordance with public policy, could not expect Gaston to bear the burden of risk of injury on the job. *Id.* at 76.

Finally, the court found it insignificant that Gaston owned his own truck because " 'a

---

**2.** Regarding this fact, the court, quoting from *Ceradsky,* 583 S.W.2d at 198, said: " 'Thus, that the work activity is of a kind necessary in the operation of the business so that if not done by

the claimant would be done by a direct employee of the business, essentially establishes the renderer of the service an employee within the purposes of the compensation law.' " 849 S.W.2d at 74.

workman who furnishes himself and the necessary equipment sells not only personal service but the use of the equipment as well and when ... the equipment is used by the worker in a continuous service integral to the business, a factual inference of employment arises.'" *Id.* at 76 (quoting *Ceradsky,* 583 S.W.2d at 200).

The facts which led to a determination that Gaston was an employee are apparent in this case. Although siding applicators require a degree of skill, Mr. Wilmot did not use his skill in a separate enterprise. He worked only for EDI for almost three years continuously until his death. His work activity was the kind necessary in EDI's business so that if not done by Mr. Wilmot, the work would be done by a direct employee of EDI (or by another like Mr. Wilmot). In working only for EDI, Mr. Wilmot could not be expected to pass the cost of insurance on to his customers because he had no customers. Finally, Mr. Wilmot, in driving his own truck and furnishing his own tools, sold his personal service and the use of his equipment to EDI. In doing so, he rendered a continuous service integral to EDI's business.

Considering the duration of employment and the true nature of Mr. Wilmot's relationship with EDI, we conclude that his work did not amount to an independent business. Our conclusion is further supported by *Shinuald v. Mound City Yellow Cab Co.,* 666 S.W.2d 846 (Mo.App.1984), where the court followed the "relative nature of the work" test and held that a cab driver was an employee. The court said:

> There is substantial evidence that claimant's work was a regular and continuous part of [the taxicab business] and not an independent business through which it would be feasible to channel the cost of work connected injury. Therefore, claimant is *a fortiori* an "employee" for the purposes of The Workers' Compensation Law.

*Id.* at 849 (citation omitted).

The Commission properly determined Mr. Wilmot's employment status. Point denied.

■ SIF's remaining point asserts that the Commission "erred in affirming the award of the administrative law judge because the evidence does not support the award of weekly death benefits to the surviving spouse and dependents from the Second Injury Fund because Mo.Rev.Stat. § 287.220.5 (1982) (sic) only imposes liability on the Second Injury Fund for 'fair, reasonable and necessary expenses in the manner required in Sections 287.240 and 287.241.'" In essence, SIF contends that it has no liability in a death case except the payment of burial expenses. EDI's failure to insure is undisputed.

Section 287.220.5 provides, in part:

> If an employer fails to insure or self-insure as required in section 287.280, funds from the second injury fund may be withdrawn to cover the fair, reasonable, and necessary expenses to cure and relieve the effects of the injury or disability of an injured employee in the employ of an uninsured employer, or in the case of death of an employee in the employ of an uninsured employer, funds from the second injury fund may be withdrawn to cover fair, reasonable, and necessary expenses in the manner required in sections 287.240 and 287.241.

In general, § 287.240 provides for the payment of death benefits and burial expenses. Section 287.240(1) provides that the employer shall pay those persons furnishing reasonable burial expenses up to an amount not exceeding $5,000.[3] Section 287.240(2) requires the employer to pay the employee's dependents a death benefit based on the employee's average weekly earnings during the year immediately preceding the death of the employee. The remainder of this provision provides for the computation of the amount of compensation required to be paid to dependents of the deceased employee.

Section 287.241, RSMo 1986, simply allows the dependent and the employer to enter into a structured settlement which provides for

---

**3.** At the time of Mr. Wilmot's death, § 287.240(1) provided for payment of burial expenses up to $2,000.

different weekly benefits than provided in § 287.240.

SIF argued the identical issue raised in this point to the Western District of this court in *Lyons v. Lyons Truck Serv.*, 831 S.W.2d 706 (Mo.App.1992). The same argument was again presented to the Eastern District in *Tatum v. St. Louis Metro Delivery, Inc.*, 887 S.W.2d 679 (Mo.App.1994). The result in both cases was adverse to SIF although the *Tatum* court failed to find the "reasoning of the *Lyons* decision particularly persuasive." *Id.* at 683.

No purpose would be served by repeating SIF's lengthy argument here. *Lyons* may be consulted for (1) the identical argument which the court rejected, and (2) the reasons for rejecting SIF's argument.

SIF cites no authority to persuade us to ignore the result reached in *Lyons* other than *Tatum's* criticism of *Lyons*. Regardless of the criticism, *Tatum* followed *Lyons*. While the statutes involved do speak in terms of benefits and expenses, we nevertheless choose to follow *Lyons* and deny SIF's point for the reasons set forth therein.

### BULMAN'S APPEAL

■ Bulman's lone point claims that the record lacks sufficient competent evidence to warrant piercing EDI's corporate veil and holding her personally liable for weekly benefits and funeral expenses to Mr. Wilmot's dependents.

The Commission adopted the ALJ's award after finding that it was supported by competent and substantial evidence. The ALJ's award imposed personal liability on Bulman upon finding that she, as

> one of two shareholders of [EDI], had pledged her personal assets for [EDI's] debts, including her own, and has been sued in her individual capacity as dba Exterior Design. The attempts of Kathryn Bulman to hide under the corporate cloak to perpetrate a fraud is and has been carried to such an extent that the courts have in past cases determined the corporate status is to be disregarded.

■ The courts employ a three-prong test in determining whether the corporate status should be disregarded. In order to "pierce the corporate veil," plaintiff must show:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice *in respect to the transaction attacked* so that the corporate entity *as to this transaction* had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Collet v. American Nat'l Stores, Inc.*, 708 S.W.2d 273, 284 (Mo.App.1986) (emphasis added); *Grote Meat Co. v. Goldenberg*, 735 S.W.2d 379, 386 (Mo.App.1987).

Careful analysis of the entire record shows that prong (1) of the *Collet* test has no evidentiary support. The only evidence relating to Bulman's control of EDI results from the testimony of Rick Davis and certain documentary evidence.

In his deposition testimony, given on July 18, 1990, Rick Davis stated that he was president of EDI which was incorporated in Iowa in 1985. Davis's testimony reveals the following:

(1) EDI conducted business in the Kansas City area for a period of time after its incorporation;

(2) Bulman was only involved in a decision-making capacity with respect to the operation of EDI in 1985 and 1986;

(3) Bulman was president of EDI during 1985 and 1986;

(4) During those years Bulman worked "with the financing" such as running the credit and establishing credit with wholesalers;

(5) During Bulman's presidency, Rick Davis was the general manager of EDI;

(6) Bulman was not an officer or director of EDI after 1986;

(7) When EDI was incorporated, Bulman and Rick Davis owned all the shares;

(8) At some point in time Bulman conveyed all her shares to Davis who currently owns all the shares of EDI.

The documentary evidence provides the following facts:

(1) Bulman was not an officer or director of EDI during the years 1987, 1988, and 1989 according to the annual Iowa corporation reports;

(2) Bulman executed UCC financing statements as president of EDI prior to 1988;

(3) As collateral for certain EDI indebtedness, Bulman mortgaged her home;

(4) After a judgment was obtained against Rick Davis, a garnishment was issued in 1987 to Bulman as garnishee. Interrogatories were later propounded to Kathryn Bulman d/b/a EDI;

(5) Rick Davis and Bulman executed a "Subjection" of Bulman's home to the Claymont Woods Homes Association Declaration; and

(6) The IRS filed tax liens against Rick Davis listing his address as Bulman's home.

Based on the above evidence, the Commission pierced the corporate veil of EDI as to Bulman after finding that she pledged her assets for EDI's debts and had been sued as d/b/a EDI. Like the evidence in general, these findings fail to demonstrate any ability of Bulman to control the business practices of EDI during the time period when EDI failed to provide workers' compensation insurance to cover Mr. Wilmot's death.

To support the Commission's award, the Respondents mainly rely on *K.C. Roofing Center v. On Top Roofing*, 807 S.W.2d 545 (Mo.App.1991). Respondents say that *K.C. Roofing* is "strikingly similar to the case at bar" because, there, Russell Nugent and his wife were the sole shareholders of a corporation in which he was president and chief operating officer and made all the decisions. Respondents argue that these facts are present in the instant case because at the time of Mr. Wilmot's death, EDI was in existence and was controlled by Bulman. Respondents are incorrect.

The difference between *K.C. Roofing* and the instant case is obvious. Unlike Russell Nugent, Bulman was neither president nor chief operating officer of EDI for almost two years before Mr. Wilmot's death. Nothing in the record indicates that Bulman had any authority to make decisions regarding EDI's business practices after her tenure as president.

Control under prong (1) is more than mere majority or complete stock control. Control is complete domination of the policy and business practices regarding the transaction attacked, i.e., failure to provide workers' compensation insurance. The evidence only shows that Rick Davis dominated the business practices of EDI for almost two years before November 10, 1988. Thus, the Commission erred in piercing the corporate veil. The record lacks sufficient competent evidence to show that Bulman had any control of EDI when workers' compensation insurance should have been provided to protect employees like Mr. Wilmot.

The award of the Commission is reversed as to Bulman's personal liability. In all other respects, the award is affirmed.

FLANIGAN and GARRISON, JJ., concur.