**Donald PORTER, Plaintiff–
Respondent–Appellant,**

v.

**ERICKSON TRANSPORT CORP.,
Defendant–Appellant–
Respondent,**

and

**U.S. Aluminate Co.—Maryland,
Defendant.**

**Nos. 18155, 18157.**

Missouri Court of Appeals,
Southern District,
Division One.

April 13, 1993.

Richard E. McLeod, Grace L. Spezia, The McLeod Law Firm, Kansas City, James W. Newberry, Schroff, Glass & Newberry, Springfield, for appellant/respondent Erickson.

Thomas Strong, Steve Garner, Jeffrey W. Bates, Strong & Associates, Springfield, for respondent/appellant Porter.

Kent O. Hyde, William C. Love, Harrison, Tucker & Hyde, Springfield, for defendant U.S. Aluminate Co.

## PER CURIAM.

By a "Contractor Operating and Lease Agreement" signed October 6, 1989, Nikki D. Porter ("Nikki") leased a tractor owned by her to Erickson Transport Corp. ("Erickson"). On November 24, 1989, Nikki's husband, Donald W. Porter ("Plaintiff") was driving the tractor, pulling a tank trailer. Erickson dispatched Plaintiff to U.S. Aluminate Co.—Maryland ("U.S. Aluminate") in Baltimore, Maryland, where liquid sodium aluminate was loaded into the trailer for delivery to a municipal water plant in Delray Beach, Florida.

Plaintiff drove the rig to Delray Beach, arriving the evening of November 26, 1989. While he was unloading the sodium aluminate, some of it got in his eyes, injuring them. Plaintiff sued Erickson and U.S. Aluminate, averring their negligence caused the injury.

One of the defenses pled by Erickson was that Plaintiff's claim "is barred by ... RSMo Chapter 287 because [his] exclusive remedy is workers' compensation benefits." In a pretrial order, the trial court ruled "there would be a separate trial of the employee/workers' compensation issue after the present trial."

A 13–day jury trial of all other issues produced a verdict assessing these percentages of fault: Erickson, 76; Plaintiff, 24; U.S. Aluminate, 0. The jury found Plaintiff's damages, disregarding any fault on his part, to be $3,700,000. From that sum, the trial court subtracted $100,000 received earlier by Plaintiff in settlement with the City of Delray Beach. The trial court further subtracted $864,000 for Plaintiff's per-

centage of fault, then added prejudgment interest of $225,326.42 per § 408.040.2, RSMo Supp.1987. Total: $2,961,326.42.

The trial court entered judgment for Plaintiff against Erickson in that amount, and against Plaintiff on his claim against U.S. Aluminate.

Afterward, the trial court granted a motion by Plaintiff for summary judgment on Erickson's "workers' compensation" defense. The trial court found Plaintiff was neither a regular employee of Erickson within the meaning of § 287.120, RSMo 1986, nor a statutory employee of Erickson within the meaning of § 287.040, RSMo 1986.

Erickson brings appeal 18155 from (a) the judgment against it on the verdict, and (b) the order granting Plaintiff's motion for summary judgment.

Plaintiff's petition contained a count seeking punitive damages from Erickson. At the close of Plaintiff's evidence in the jury trial, the trial court directed a verdict against Plaintiff on that issue. Plaintiff brings appeal 18157 challenging that ruling.

We consolidated the appeals, but address them separately in this opinion.

### Appeal 18155

■ Erickson's brief presents six points. The first five pertain to the jury trial. The sixth, which we address first, avers the trial court wrongly granted Plaintiff's motion for summary judgment on Erickson's "workers' compensation" defense.

Erickson makes two contentions in support of the point, designating them "A" and "B." Contention "A" avers the trial court erroneously found there was no material issue of fact as to whether Plaintiff was an employee of Erickson or an independent contractor when he was injured.

The agreement referred to in the first sentence of this opinion designates Erickson as "Carrier" and Nikki as "Contractor." It provides, in pertinent part:

[§] 1. ... Contractor represents that he is the owner of such equipment. Contractor shall provide receipt of payment of Federal Highway Use Tax, and a copy of title or title registration.

[§] 2. ... This lease shall commence on the date of this Agreement and shall remain in effect until terminated as provided herein, or until January 31st of the following year.

[§] 3. ... For the full and proper performance of each trip made by the Contractor in accordance with this Agreement, Carrier agrees to pay to Contractor 73 percent of the Carrier's gross revenue earned.

. . . .

[§] 5. ... Contractor agrees to use the Equipment (together with drivers and all other necessary labor) to transport, load and unload on behalf of Carrier, or on behalf of such other certified carriers as Carrier may designate through authorized "trip lease" or interchange agreements, such commodities as Carrier may make available to Contractor. . . .

[§] 6. ... Contractor shall not trip lease the equipment listed herein to any other carrier, or person without first having obtained specific written approval to do so from Carrier. . . .

[§] 7. ... Contractor shall be responsible to Carrier for satisfying all applicable State and Federal regulatory requirements and statutes, subject at all times to verification by the Carrier. To discharge such responsibility Contractor shall perform the following duties:

. . . .

C. Contractor shall hire only those drivers who are qualified under all applicable regulations and statutes. Contractor shall permit Carrier to screen, test and obtain necessary paper work as is required by all applicable regulations for all persons who are to operate the vehicle.

. . . .

[§] 9. ... It is specifically understood and agreed that Contractor, its drivers and/or helpers are not agents, employees or servants of the Carrier. Contractor agrees and it is understood by the parties that Contractor is an independent Con-

tractor who shall select his own drivers subject to the processing and qualification requirements established herein and the Contractor shall determine the manner in which those drivers shall be compensated. Contractor hereby agrees to comply with the provisions of the Fair Labor Standard Act, Workman's Compensation laws, Social Security, Income Tax Withholding requirements and Unemployment Compensation laws which may be applicable to himself and his employees. The Carrier shall not be responsible for the wages and expenses of Contractor's employees, agents or servants. Contractor shall hold Carrier harmless from any liability arising from a relationship between Contractor and any of Contractor's employees, agents or servants whether under industrial accident laws, workman compensation laws, or other state or federal laws applicable to employers and employees. Contractor shall maintain workman compensation coverage for the Contractor and any employee, agent or servant whom Contractor employs in the performance of this agreement. In addition, Contractor shall withhold state and federal income taxes, social security, unemployment insurance and other payroll taxes upon the wages paid by Contractor to Contractor's employees. Contractor shall be and is responsible for selecting, purchasing, financing and maintaining its equipment. Contractor is responsible for selecting all routes, except for loads requiring state or local permits where the governmental agency will establish the route over which he must travel.

....

[§] 11. ... Contractor agrees to pay for all operating expenses in any way relating to or connected with the Equipment, including without limitation, all expenses of fuel, oil, fuel taxes, maintenance, service, materials and repairs, and to pay all privilege taxes, inspection fees, and any other taxes, fees and charges assessed by any taxing or governmental authority on the Equipment, including but not limited to, road tolls, ferries, mileage taxes, Federal use taxes, fuel taxes, registration fees, prorate license fees, ad valorem personal property taxes, ... permits or any other levies or assessments based upon the use and operation of the Equipment....

....

[§] 17. ... Contractor shall maintain in full force and effect Workmen's Compensation Insurance on the Contractor and Contractor's employees while performing lawful and proper duties under this agreement....

....

[§] 24. ... Either party shall have the right to cancel this Agreement at any time on notice to the other party. Termination in such cases, unless otherwise specified in the notice, shall be effective in thirty (30) days, unless otherwise terminated as hereinafter provided. In the event of insolvency, receivership or bankruptcy of Contractor, Carrier shall have the right to cancel and terminate this Agreement without notice, and Carrier may terminate this Agreement and without notice in the event of any breach or failure to comply by Contractor with any term of this Agreement....

Because Erickson hauls liquids in bulk, tractors leased to it must be equipped with a pump. When Erickson leases a tractor lacking a pump, the custom is that Erickson buys one and sells it to the lessor. The lessor has the option of hiring one of Erickson's mechanics to install the pump, on the latter's own time, or having the pump installed elsewhere.

Nikki's tractor lacked a pump. Erickson bought one, and it was installed on Nikki's tractor by an Erickson mechanic. The cost was to be deducted from Erickson's payments to Nikki.

The pump had a pressure relief valve, a safety device that prevents excessive pressure from building up if a hose becomes clogged while the pump is operating.

As Plaintiff was unloading the sodium aluminate at Delray Beach, the pump began to "whine." When Plaintiff stooped to examine it, the hose "blew up" and sodium aluminate struck him in the face, entering

his eyes. Plaintiff's evidence showed this occurred because the pressure relief valve had been installed "upside down."

Erickson asserts there are fact issues which, if resolved favorably to it, support a finding that Plaintiff was its "statutory employee by appointment." Erickson maintains Missouri cases hold a driver appointed by a lessor of a truck to fulfill a lease is a statutory employee of the lessee by appointment.

The first case Erickson cites to support this contention is *Miller v. Hirschbach Motor Lines, Inc.*, 714 S.W.2d 652 (Mo.App. 1986). There, a lessor's wife was driving the leased tractor, hauling cargo for the lessee-carrier, when an accident occurred, injuring her. She was awarded workers' compensation benefits from the carrier by the Labor and Industrial Relations Commission despite the carrier's argument that she was not its employee. This Court affirmed, holding first that the husband-lessor was the carrier's employee within the meaning of § 287.020.1, RSMo 1978, which defined employee as: "... every person in the service of any employer ... under any contract of hire, express or implied, oral or written, or under any appointment or election...."

This Court noted a comment in a text on workers' compensation that there is a growing tendency to classify owner-drivers of trucks as employees when they perform continuous service which is an integral part of the employer's business. 714 S.W.2d at 656. This Court further noted it is the actual conduct of the parties, not the language of the written contract, which establishes the work status of a particular worker. *Id.* at 657.

References to the lease in *Miller* reveal some of its provisions resemble those in the lease here. However, one provision in the *Miller* lease provided compensation for a "Double Driver operation" at a higher rate than for a single driver operation. *Id.* Another provision allowed the lessor to employ assistant drivers, but each was subject to approval by the carrier. *Id.* at 659.

This Court found two circumstances which established the lessor was the carrier's employee: (1) the carrier's control of the work, and (2) the carrier's power to summarily discharge the lessor. *Id.* at 658[10]. This Court then considered whether the lessor's wife was the carrier's employee, noting she was not paid separately when the lessor enlisted her as an assistant driver. This Court cited the following passage from *Stegeman v. St. Francis Xavier Parish*, 611 S.W.2d 204, 206[1] (Mo. banc 1981):

> In Missouri, an uncompensated worker is an employee by appointment if he is in the service of an employer and that employer exercises control, or has the right of control, over the worker.

*Miller*, 714 S.W.2d at 659.

This Court concluded the carrier had as much control over the lessor's wife—when she was driving—as it had over the lessor. *Id.* at 660. Furthermore, she could drive for the carrier only with its approval. Consequently, this Court held the lessor's wife was the carrier's employee by appointment and affirmed her workers' compensation award. *Id.*

The second case Erickson cites to support contention "A" of its sixth point is *Ellegood v. Brashear Freight Lines*, 236 Mo.App. 971, 162 S.W.2d 628 (1942). There, the owner of a truck employed a driver to drive it. The owner contracted with a carrier to furnish the truck and driver to the carrier. The owner continued to pay the driver's wages. The driver was injured operating the truck on the carrier's premises. The driver filed a negligence suit against the carrier. The carrier pled the driver's exclusive remedy was workers' (then workmen's) compensation. Specifically, the carrier asserted that inasmuch as the accident occurred on its premises in the usual course of its business, the driver was its statutory employee per § 3698, RSMo 1939 (now § 287.040, RSMo 1986), which read:

> (a) Any person who has work done under contract on or about his premises which is an operation of the usual business which he there carries on shall be deemed an employer and shall be liable under this chapter to such contractor, his

subcontractors, and their employees, when injured or killed on or about the premises of the employer while doing work which is in the usual course of his business.

. . . .

The appellate court held the driver was not the carrier's statutory employee under the above statute because the carrier did not employ the lessor to do hauling for the carrier; that is, the carrier contracted no hauling to the lessor, but merely procured additional facilities from the lessor to perform the carrier's business. 162 S.W.2d at 631. However, the court found the driver was a borrowed servant because the following test was met: (a) consent by the driver to work for the carrier; (b) actual entry by the driver upon the work of and for the carrier pursuant to an express or implied contract to do so; (c) power of the carrier to control the details of the work to be performed and to determine how it shall be done and whether it shall stop or continue. *Id.* at 633–34[4] and [5]. Inasmuch as the carrier came within the scope of the workers' (then workmen's) compensation law, the driver's remedy, if any, was under it. *Id.* at 634–35[9]. Consequently, his negligence suit was barred.

Plaintiff says the undisputed facts here distinguish this case from *Miller* and *Ellegood.* In support of his motion for summary judgment, Plaintiff presented the trial court massive documentation including depositions of Harlan Cavin, Erickson's safety director who signed the agreement with Nikki on Erickson's behalf. Cavin confirmed the compensation to be paid by Erickson was payable to . Nikki, and her name was on the "1099 Form." Erickson paid Plaintiff nothing. The pay arrangement between him and Nikki was irrelevant to Erickson.

Cavin conceded that if Erickson's business was "slow," nothing in the agreement barred Plaintiff from driving a truck (other than Nikki's tractor) for another employer, as long as he reported it on his "logs." Cavin also acknowledged Erickson had no right to select the route driven by Plaintiff

from embarkation to destination. Erickson had such right as to its "employee drivers."

Cavin explained the customer sets the deadline for delivery, and as long as Plaintiff met the deadlines he could drive any hours he wanted, "assuming he stayed within DOT guidelines." If Plaintiff stayed in a motel at night, Erickson was not obligated to pay the bill. Under some circumstances when its employees spend the night in a motel, Erickson pays the bill.

Cavin further admitted that if Plaintiff wanted to carry a "qualified driver under DOT regs" as a passenger, he could do so "as long as the work comp was paid on it." Erickson's employees must obtain approval from Erickson to carry a passenger. Erickson had no right to tell Plaintiff where to purchase gasoline. Erickson's collective bargaining agreement with its employees authorizes Erickson to require them to stop for gasoline at certain self-service stores. The agreement also gives Erickson the right to require its employees to wear a uniform. The agreement between Erickson and Nikki did not grant Erickson the right to require Plaintiff to wear a uniform.

Additionally, Erickson's employee drivers are required to "call in" at specific times. Nothing in the agreement between Erickson and Nikki required Plaintiff to do so.

Plaintiff maintains the circumstances enumerated in the four preceding paragraphs establish Erickson had no right to control the details of his work, one of the elements on which *Miller* and *Ellegood* hinged in finding the driver was the carrier's employee. Thus, says Plaintiff, neither case supports Erickson's "workers' compensation" defense.

In *Ballinger v. Gascosage Electric Cooperative,* 788 S.W.2d 506 (Mo. banc 1990), a defendant claimed it was immune from a negligence suit by an injured worker because he was its employee, hence his remedy was workers' compensation. The Supreme Court of Missouri said:

Any rights which the plaintiff might have had at common law are supplanted and superseded by the workers' compensation act, if it applies. Whether or not

the case comes within the provision of the act is a question of fact.... An injured plaintiff may file an action at common law. The defendant may assert by motion or answer that the court lacks jurisdiction of the subject matter because plaintiff was an employee when injured. Rule 55.27. The court may hear the matter in the manner permitted in Rule 55.-28. If the court finds jurisdiction the parties may proceed to trial. If it finds no jurisdiction, the plaintiff may appeal.... The employer-defendant has the burden of establishing the bar of the Workers' Compensation Act as an affirmative defense.

*Id.* at 514–15. (A holding in *Ballinger* on an unrelated point was overruled by *Zueck v. Oppenheimer Gateway Properties, Inc.,* 809 S.W.2d 384 (Mo. banc 1991).) [1]

Another case where an injured worker brought a negligence suit and the defendant asserted the sole remedy was workers' compensation is *Harryman v. L & N Buick–Pontiac, Inc.,* 431 S.W.2d 193 (Mo. banc 1968). The opinion states:

Being in derogation of the common law, the [workers' compensation] act must be strictly construed where existing common law rights and remedies are affected. Common law rights and remedies should not be taken from an employee unless they are abolished by clear and unambiguous terms.

*Id.* at 196[3]. *Accord: Huff v. Union Electric Co.,* 598 S.W.2d 503, 510–11[6, 7] (Mo. App.1980), which adds that if there is a close question, the decision should be weighted in favor of retention of the common law right of action.

Erickson's main brief identifies no detail of Plaintiff's work that Erickson controlled. Erickson's reply brief does point out Plaintiff was required to have the cargo tank washed out after each haul. That is understandable, as Erickson hauls all types of liquid commodities in bulk, ranging from "benign nonhazardous food grade products" to hazardous chemicals including flammables, combustibles and corrosives.

The only other control Erickson exercised was deciding which shipments it would make available to Nikki. Hauling them was the responsibility of her drivers, without interference by Erickson. Nikki's agreement with Erickson did not require her to furnish Plaintiff as the driver of her tractor. Section 9 of the agreement (quoted *supra*) allowed her to select her own drivers, so long as they had the required qualifications.

The undisputed facts here differ from those in each case on which Erickson relies to support contention "A" of its sixth point. We set forth the differences hereunder.

In *Miller,* 714 S.W.2d 652, the lease provided two rates of compensation, one for a double driver operation and another for a single driver operation. Here, Nikki received a constant percentage of the gross revenue from the hauls, regardless of the number of drivers. In *Miller,* the carrier reserved the right to approve assistant drivers; here, Erickson did not. Furthermore, in *Miller* the lessor had hauled for the carrier several years. The agreement between Nikki and Erickson was signed October 6, 1989, and section 2 of it (quoted *supra*) provided it would end January 31 of the following year unless otherwise terminated. There was no long-term relation-

---

1. There is a line of cases holding that where an injured employee sues his employer and the question is whether the injury resulted from an accident arising out of and in the course of employment or from an intentional act of the employer, jurisdiction to decide such issue lies exclusively with the Labor and Industrial Relations Commission. *Killian v. J & J Installers, Inc.,* 802 S.W.2d 158, 160–61[3] (Mo. banc 1991); *Yount v. Davis,* 846 S.W.2d 780 (Mo.App.1993); *Chambers v. Figgie International, Inc.,* 838 S.W.2d 168, 170–71 (Mo.App.1992). The issue confronting us here is not whether Plaintiff's injury resulted from an accident arising out of and in the course of his employment. Obviously, it did. The question is whether Erickson was Plaintiff's employer when the accident occurred. The cases cited in this footnote do not divest the trial court of jurisdiction to decide that issue. To hold otherwise would force upon an accident victim the absurd task of filing a workers' compensation claim naming the alleged tort-feasor as the victim's employer, then attempting to convince an administrative law judge that the tort-feasor was not the victim's employer.

ship between Erickson and Nikki or Plaintiff.

In *Ellegood,* 162 S.W.2d 628, the lessor contracted with the carrier to furnish the truck and a specific driver. The carrier had complete control over the details of the driver's work. Furthermore, in addition to suing the carrier, the driver filed a workers' compensation claim naming the carrier as his employer. None of those circumstances exist here.

In *Ballard v. Leonard Brothers Transport Co., Inc.,* 506 S.W.2d 346 (Mo.1974), another case cited by Erickson, a company owned several tractors and employed several drivers. It hired out the tractors and drivers to other companies to haul their trailers and merchandise. One driver, for a period of some two years, went to the same carrier each morning and reported to its terminal manager for instructions concerning his day's work. He worked a five-day, forty-hour week, with overtime, all for the same carrier. In a negligence suit by the driver against the carrier, the driver was held to be a borrowed servant of the carrier. Here, Plaintiff worked no fixed hours for Erickson and, as noted earlier, Erickson controlled virtually no details of Plaintiff's work.

*Wright v. Habco, Inc.,* 419 S.W.2d 34 (Mo.1967), also cited by Erickson, did not involve a truck owner, driver or carrier.

In *Reichert v. Jerry Reece, Inc.,* 504 S.W.2d 182 (Mo.App.1973), cited by Erickson, the driver of a leased tractor brought a workers' compensation claim against the lessee-carrier. The driver was paid by the lessor, but the carrier had the right to approve drivers. The driver obtained a physical examination and delivered the report to the carrier. The driver also filed an application for employment with the carrier. During hauls, the driver reported to the carrier to let it know he was on schedule. This Court affirmed a workers' compensation award against the carrier, holding the Industrial Commission could have reasonably found the driver either made a contract of hire with the carrier or entered into its services by appointment or election. *Id.* at 186–87. Here, Erickson had no right

to reject a qualified driver hired by Nikki, and nothing in the agreement required Plaintiff to call in to Erickson during a haul.

*Patton v. Patton,* 308 S.W.2d 739 (Mo. 1958), cited by Erickson, was a workers' compensation claim for the death of a driver. He drove a tractor owned by a lessor, under lease to a carrier. The carrier had the right to approve drivers, specifically selected the driver for what proved to be the fatal journey, selected the route, and selected the places to park the rig during the journey. The Supreme Court of Missouri held the evidence sufficient to support an award against the carrier.

*Shinuald v. Mound City Yellow Cab Co.,* 666 S.W.2d 846 (Mo.App.1984), cited by Erickson, was a workers' compensation case involving a taxicab driven by its owner under an agreement with a cab company whereby the latter dispatched the cab to pick up passengers. Cabs had to be fueled at the company's pumps and had to await calls at cabstands or designated locations at restaurants, hotels and transportation depots. An award of workers' compensation benefits in favor of the driver against the cab company was affirmed.

In sum, Erickson cites six cases involving a driver and a common carrier. Four of the six are workers' compensation cases where appellate courts affirmed awards to the driver or his survivors: *Miller, Reichert, Patton* and *Shinuald.* Those four illustrate the well-established principle that the fundamental purpose of workers' compensation is to place upon industry the losses sustained by employees resulting from injuries arising out of and in the course of employment. *Wolfgeher v. Wagner Cartage Service, Inc.,* 646 S.W.2d 781, 783 (Mo. banc 1983). Where an injured employee claims workers' compensation benefits, any doubt about his right to them should be resolved in his favor. *Id.* at 783[2].

However, the four cases identified in the second sentence of the preceding paragraph, while of some relevance here, are not controlling in that Plaintiff is as-

serting a common law negligence claim—not a workers' compensation claim—against Erickson, and Erickson raises workers' compensation as a defense. As we have seen, because the workers' compensation act is in derogation of the common law, it must be strictly construed where common law rights and remedies are affected. *Harryman*, 431 S.W.2d at 196[3]; *Canady v. Crystal Development Corp.*, 756 S.W.2d 607, 610–11[4] (Mo.App. 1988). When the question is close, the decision should be weighted in favor of retention of common law rights. *Huff*, 598 S.W.2d at 511. Furthermore, each of the four cases identified in the second sentence of the preceding paragraph differs factually in one or more respects from the instant case, as explained earlier.

The other two cases on which Erickson relies, *Ellegood* and *Ballard*, have greater *stare decisis* value, as each involved a negligence suit by a driver against a carrier, who successfully asserted workers' compensation as a defense. We have already pointed out factual differences between those cases and the instant case. While such differences may not alone be sufficient to attenuate the precedential value of those cases here, there are other circumstances in the instant case, not yet discussed, that differentiate it from those two.

From the documentation supplied the trial court by Plaintiff in support of his motion for summary judgment, we learn drivers of vehicles leased to Erickson were not covered by its workers' compensation insurance. This resulted in lower premiums for Erickson. Nikki carried workers' compensation insurance naming her as Plaintiff's employer. As of March 21, 1991, benefits exceeding $40,000 had been paid, and Plaintiff's workers' compensation claim was still pending.

As we have seen, the agreement between Nikki and Erickson explicitly states Nikki's drivers are not employees or servants of Erickson. The agreement requires Nikki to maintain workers' compensation coverage for anyone she employs in performing the agreement. She did.

Now, contrary to the solemn recitals of the agreement (and wholly inconsistent with the conduct of the parties prior to the accident), Erickson unabashedly asserts Plaintiff was its employee for workers' compensation purposes, thereby insulating Erickson from common law negligence liability.

■ We recognize that generally, when a point of law has been settled by decision, it forms a precedent which is not afterwards to be departed from, but we also bear in mind that no prior decision is a precedent, nor does it take its place as *stare decisis* in a pending case, where the facts are inapplicable. *Globe Indemnity Co. v. First National Bank in St. Louis*, 133 S.W.2d 1066, 1069–70[2] (Mo.App.1939). For a general rule of law to have application to any given case, the facts and circumstances of such case must come within the reason of the rule. *Wolf v. Wuelling*, 233 Mo.App. 1144, 130 S.W.2d 671, 680[9] (1939).

■ Generally, a party will not be permitted to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him. *Seifner v. Weller*, 171 S.W.2d 617, 623[13] (Mo.1943). Because of the painstaking effort Erickson made in a calculated strategy to insulate itself from workers' compensation liability to Nikki's drivers, we are unpersuaded *Ellegood*, 162 S.W.2d 628, and *Ballard*, 506 S.W.2d 346, must be blindly followed to allow Erickson to now escape common law liability to Plaintiff by proclaiming he was its employee for workers' compensation purposes.

■ We recognize that in reviewing the trial court's grant of summary judgment for Plaintiff on Erickson's "workers' compensation" defense, we must scrutinize the record in the light most favorable to Erickson, the party against whom the trial court ruled. *Cavin v. Kasser*, 820 S.W.2d 647, 649[1] (Mo.App.1991); *Barnes v. City of Lawson*, 820 S.W.2d 598, 599[1] (Mo.App. 1991); *Missouri Board for Architects, Professional Engineers and Land Surveyors v. Earth Resources Engineering, Inc.*, 820 S.W.2d 505, 507[3] (Mo.App.1991).

However, if the summary judgment is sustainable as a matter of law under any theory, we must affirm it. *Ernst v. Ford Motor Co.*, 813 S.W.2d 910, 915[1] (Mo.App. 1991); *Meyer v. Enoch*, 807 S.W.2d 156, 158[2] (Mo.App.1991); *Kutz v. Cargill, Inc.*, 793 S.W.2d 622, 624 (Mo.App.1990).

Summary judgment is authorized by Rule 74.04,[2] the current version of which took effect January 1, 1988. Vol. 727–728 S.W.2d Missouri Cases, pp. XXV–XXXV. Paragraph (c) of the rule reads, in pertinent part:

The judgment sought shall be entered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Under Rule 74.04 as it now exists, a motion for summary judgment need not rest on unassailable proof. *Martin v. City of Washington*, 848 S.W.2d 487, 492 (Mo. banc 1993). A party resisting a motion for summary judgment must demonstrate a fact issue exists that would permit a reasonable jury to return a verdict for the resisting party. *Id.*

While the record contains a staggering amount of documental material pertinent to Erickson's "workers' compensation" defense, we hold there is no genuine issue as to any *material* fact affecting that issue. Contention "A" of Erickson's sixth point (which asserts there is, but identifies no such issue) is denied.

We further hold the facts heretofore set forth in our discussion of Erickson's contention "A" support the trial court's find-ing (detailed *supra* in the sixth paragraph of this opinion) that Plaintiff was not Erickson's employee. The trial court did not erroneously apply the law in that determination.

Because we have rejected contention "A" of Erickson's sixth point, we need not address contention "B." It attacks a conclusion by the trial court that even if Plaintiff were Erickson's employee, the sale and installation of the pump was part of a "separate transaction" between Erickson and Nikki, unrelated to Plaintiff's employment. As we have upheld the trial court's finding that Plaintiff was not Erickson's employee for the purpose of insulating Erickson from common law negligence liability for Plaintiff's injury, Erickson's contention "B" is moot. The trial court's order granting Plaintiff summary judgment on Erickson's "workers' compensation" defense is affirmed.

We now turn to Erickson's assignments of error regarding the jury trial.[3] Erickson's first point avers the trial court erred in allowing Plaintiff to show the jury a "videotape experiment illustrating the expert opinion that if [he] had worn his required safety gear it would not have done any good."

The origin of this issue appears in opening statements. Erickson's lawyer said: "... the evidence in this case really lets you come to one conclusion ... in terms of why ... Don Porter was injured ... and we believe that will be the fact that he didn't have his eye protection on.... [W]e believe the evidence will show clearly the only thing that we can be certain of is if he

---

2. Rule references are to Missouri Rules of Civil Procedure (1992).

3. Plaintiff has asserted, as one of the points in his respondent's brief, the claim that Erickson's points on appeal violate Rule 84.04(d). Plaintiff contends that Erickson's points on appeal do not identify specific actions or rulings of the trial court claimed to be erroneous and fail to specify "wherein and why" such actions and rulings were error. Erickson's points on appeal are anything but a model of appellate practice. Attorneys undertaking to prepare appellate briefs would be well-served to review Rule 84.04 and the discussion of "points on appeal" in *Thummel v. King*, 570 S.W.2d 679, 684–86 (Mo. banc 1978), and to be mindful that the rule's requirements are mandatory. *Hoffman v. Koehler*, 757 S.W.2d 289, 292 (Mo.App.1988). Other than with respect to Erickson's fifth point on appeal, discussed *infra*, this court has gleaned the issues raised by Erickson's appellant's brief sufficiently to permit appellate review. Erickson's fifth point was reviewed, *ex gratia*, for plain error.

had had it on, we wouldn't be here today." [4]

Evidence pertinent to the "experiment" came from Plaintiff's witness, Gary William Friend, a "licensed professional engineer." He testified hoses used on tank trailers have a "working pressure" of 150 pounds per square inch, a "proof test" of 300 pounds per square inch, and a "burst pressure" of 600 pounds per square inch. Therefore, said Friend, such hoses fail at pressure between 300 and 600 pounds per square inch.

Plaintiff testified he was "about four feet away" from the pump when he "bent over" to look at it. Plaintiff's evidence established the hose ruptured near its connection at the pump's "discharge port." Friend indicated the rupture was "a couple of inches" in size, and circumferential.

Plaintiff recounted the sodium aluminate "hit me directly in the face."

Friend explained that had the pressure relief valve been installed correctly, the pressure in the hose would not have exceeded 100 pounds per square inch. He opined the pressure that ruptured the hose "was around 450 pounds per square inch, in between 300 and 600." Consequently, sodium aluminate came through the rupture at "[a]bout 450 pounds per square inch ... all at once." According to Friend, that was the force with which the sodium aluminate hit Plaintiff.

Before trial, Plaintiff's counsel arranged two "tests," both of which were videotaped. The first was supervised by Jerry Donald Coday. Sandbags were belted to a mannequin so it weighed 154 pounds. The mannequin was seated in a chair, but not strapped to it. "Splash goggles" were placed on the mannequin's head, secured by their strap which, according to Coday, was "as tight or tighter than you would normally wear them."

The nozzle of a hose was positioned with its aperture four feet from the goggles. The diameter of the aperture was $5/16$ inch. Water was propelled through the hose under pressure of 300 pounds per square inch. As to the duration of the "burst of water," Coday testified the person holding the nozzle "just opened it up and closed it just almost immediately."

The exercise was performed six times, each with the spray at a different angle, but always four feet away. On each occasion, the goggles were knocked off the mannequin's head. A seventh repetition was done with the aperture ten feet from the mannequin, "directly in front." Again, the goggles were knocked off.

The second test arranged by Plaintiff's counsel was supervised by Michael Logue. This time, the mannequin was wearing splash goggles plus a hard hat with an attached face shield. According to Logue, the hard hat was "snug, tight" on the mannequin's head. The nozzle aperture and water pressure were the same as Coday's test.

In Logue's test, water was discharged toward the head on six occasions, each at a different angle but always four feet away. On each occasion, the goggles, hard hat and face shield were knocked off the mannequin's head.

Engineer Friend testified, "[T]he test ... is conservative compared to what happened to Mr. Porter." Friend explained the "field of spray" that hit Plaintiff would have been larger than that in the experiments, as the rupture in the hose was larger than the nozzle aperture. Friend added that the "actual impact" on Plaintiff would have been greater than that on the mannequin because the specific gravity of sodium aluminate and the specific gravity of water are, respectively, 1.47 and 1.0. That is, sodium aluminate is "one half times heavier."

---

**4.** This issue was submitted to the jury. Instruction 10, tendered by Erickson and given by the trial court, read:

> In your verdict you must assess a percentage of fault to plaintiff if you believe:

> First, plaintiff did not wear his safety gear while unloading sodium aluminate in Del Ray [sic] Beach, Florida, and
> Second, plaintiff was thereby negligent, and
> Third, such negligence of plaintiff directly caused or directly contributed to cause any damage plaintiff may have sustained.

Erickson complains that (a) the experiments were not substantially similar to the incident that injured Plaintiff, and (b) the experiments were not disclosed before trial "even though the parties had agreed to exchange expert information." [5]

As to complaint "(a)":

The law is well settled that experimental evidence is admissible when the experiment was made under conditions substantially similar in essential particulars to the conditions which prevailed at the time of the occurrence in suit, and that the conditions need not be identical. The similarities must be in those circumstances or conditions as might supposedly affect the result in question; and the degree of similarity or difference should be judged in the light of the fundamental principle that any fact should be admissible which logically tends to aid the trier in determination of the issue. In determining this question of sufficient similarity, a substantial measure of discretion must be accorded to the trial judge.

*Blevins v. Cushman Motors*, 551 S.W.2d 602, 610[9–12] (Mo. banc 1977) (citations omitted).

■■■ The proponent of experimental evidence has the burden of presenting a foundation showing the test, in material aspects, has the requisite similarity to the conditions or occurrences at issue in the suit. *Lawson v. Schumacher & Blum Chevrolet, Inc.*, 687 S.W.2d 947, 954[8] (Mo.App.1985). Variances in conditions which are more detrimental to the proponent of the test than those which existed in the incident at issue will not bar admission. *Blevins*, 551 S.W.2d at 609–10; *Lawson*, 687 S.W.2d at 954[9].

In *Salsberry v. Archibald Plumbing & Heating Co., Inc.*, 587 S.W.2d 907 (Mo.App. 1979), the incident in issue was an explosion. The Western District of this Court said:

There is of course no way exactly to reconstruct conditions as they existed at the instant before or at the instant of the explosion. It is sufficient for admissibility of such tests that *salient conditions* be substantially similar. *Klaesener v. Schnucks Markets, Inc.*, 498 S.W.2d 555, 558–9 (Mo.1973); *Faught v. Washam*, 329 S.W.2d 588, 598 (Mo.1959).

In the admission or exclusion of test results, a certain discretionary latitude is allowed to the trial judge. The ultimate test of admissibility is whether the test results will be of aid to the jury in deciding the issues of the case. The results of the tests having been admitted into evidence, they may be exposed to cross-examination and any supposed dissimilar conditions examined. The value of the test results is then for the jury to assess.

*Salsberry*, 587 S.W.2d at 912[2–4].

Erickson cites four cases involving admissibility of experiments. In one, an appellate court found no error in admission of evidence about tests for gunpowder marks when a revolver was fired at various distances from an object. *Lynch v. Railway Mail Association*, 375 S.W.2d 216 (Mo.App. 1964). Citing *Lynch v. Missouri–Kansas–Texas R. Co.*, 333 Mo. 89, 61 S.W.2d 918, 921 (1933), the Court in the 1964 *Lynch* case held, "[T]he trial judge should not be hampered by arbitrary rules which, if drawn in detail as to this class of evidence, would obviously be so technical as to be difficult of application and productive of appeals." 375 S.W.2d at 220.

■■■ In the other three cases cited by Erickson, appellate courts found no error in exclusion of evidence about experiments. The earliest of the three was the 1933 *Lynch* case mentioned in the preceding paragraph. The other two were *State v. Johnson*, 721 S.W.2d 23 (Mo.App.1986), and *Deskin v. Brewer*, 590 S.W.2d 392 (Mo. App.1979). None of the experiments in those three cases remotely resemble the experiments in the instant case, and we need not lengthen this opinion by discussing those cases in detail. All of them honor the proposition that admission or exclusion of such evidence is entrusted to the

---

**5.** The running time of the videotape of both experiments, in the aggregate, is less than 12 minutes.

trial court's discretion, and reversal will occur only where discretion is abused. *Lynch,* 61 S.W.2d at 921; *Johnson,* 721 S.W.2d at 27[3]; *Deskin,* 590 S.W.2d at 397.

In the argument portion of its brief, Erickson quotes objections at trial to the effect that the experiments lacked substantial similarity with the incident where Plaintiff was injured. Among the differences were: water was used in the experiments, but Plaintiff was hit by sodium aluminate; the water pressure in the experiments was 300 pounds per square inch, but the pressure that hit Plaintiff is unknown; the volume of water hitting the goggles and face shield in the experiments is shown, but the volume of sodium aluminate that hit Plaintiff is unknown; the angles at which the water hit the goggles and face shield in the experiments is shown, but the angle at which the sodium aluminate hit Plaintiff is unknown.

Friend was asked about the differences on direct and cross-examination, hence the differences—together with the similarities—were before the jury, which could assess the value of the experiments in determining whether Plaintiff could have avoided injury by wearing goggles and a face shield.

We hold there was sufficient evidence from which the trial court could find the experiments were made under conditions substantially similar in essential particulars to the conditions surrounding Plaintiff's accident. Additionally, there was sufficient evidence from which the trial court could find the differences between the experiments and Plaintiff's accident were such that the conditions of the experiments were more detrimental to Plaintiff than to Erickson. We therefore conclude the trial court did not abuse its discretion in allowing the jury to see the videotape. Complaint "(a)" of Erickson's first point is denied.

■ However, even had the foundation for admissibility of the experiments been inadequate, there was no reversible error

in their admission. That is because the experiments were not the only evidence as to whether goggles and a face shield would have remained in place had Plaintiff been wearing them when struck by the sodium aluminate. During cross-examination by U.S. Aluminate's lawyer, and without objection by Erickson's lawyer,[6] this dialogue occurred:

Q ... wouldn't you agree with me that it would make a difference how tight these [goggles and face shield] were on a person's head with respect to what kind of force it would take to knock them off?

A Well, using those goggles it wouldn't make any difference.... They're just going to come off.... If they're hit by the impact of the explosion, it's over, they're gone.

Q Okay. What you're telling us is you believe if Don Porter had had these goggles on when he was unloading this sodium aluminate in Delray Beach, the force of that explosion is going to blow them off his head anyway?

A That's right.

....

Q And you also believe even if he'd had these on and this hard hat on, right?

A Yes.

Q And had the face field [sic] down, it's going to blow them all off?

A That's correct.

Q This and the goggles?

A That's correct.

■ In direct examination, Friend had expressed no opinion on whether the goggles and face shield would have been dislodged by the force of the sodium aluminate. However, because of the testimony quoted above, received without objection by Erickson, the videotape experiments became cumulative to Friend's opinion that when the hose burst, the sodium aluminate would have blown the goggles and face shield off Plaintiff had he been wearing them. A party is not entitled to assert prejudice by admission of evidence if such

**6.** The lawyers representing Erickson in this appeal are not the lawyers who represented Erickson at trial.

evidence is merely cumulative to other related admitted evidence. *Biller v. Big John Tree Transplanter Mfg.*, 795 S.W.2d 630, 635[12] (Mo.App.1990); *Iota Management Corp. v. Boulevard Investment Co.*, 731 S.W.2d 399, 411[5] (Mo.App.1987).

■ In regard to complaint "(b)" of its first point, Erickson directs us to a letter from Plaintiff's lawyer to opposing counsel six days before trial. The letter is in response to a request by U.S. Aluminate's counsel that Plaintiff's counsel "disclose any additional work that [Plaintiff's] experts have done which would change or alter their opinions at trial." Erickson insists the letter confirms an agreement between counsel to inform each other "if experts did any additional work or came to any new or altered opinions." The videotape experiments are unmentioned in the letter. Therefore, says Erickson, the trial court should have excluded them.

We disagree. The experiments were not performed by Friend. Indeed, he was not even present when they were carried out. Consequently, they did not constitute "additional work" by him. The experiments merely utilized Friend's opinion that the hose ruptured at pressure of at least 300 pounds per square inch. Friend revealed that opinion when his deposition was taken by Erickson three months before trial. Erickson does not claim it was surprised by Friend's testimony to that effect at trial.

The other circumstances under which the videotape experiments were conducted were based on Plaintiff's version of the accident. Erickson does not contend it was surprised by that testimony. Complaint "(b)" of Erickson's first point has no merit.

■ Erickson's second point has two parts, designated "A" and "B." Part "A" avers the trial court "erroneously allowed the introduction of evidence of [Plaintiff's] good character." From the argument following the point, we learn that the evidence about which Erickson complains is: (1) an August 11, 1987, letter to United Van Lines (by whom Plaintiff was then employed) from a motorist expressing gratitude for emergency assistance Plaintiff gave her and members of her family along the road-side, (2) a recommendation by an official of United Van Lines that Plaintiff receive an "Exemplary Service Recognition Award" for his actions, and (3) a letter to Plaintiff from a United Van Lines official conferring the award and presenting Plaintiff a $500 check.

Citing *Haynam v. Laclede Electric Co-op., Inc.*, 827 S.W.2d 200, 205–08 (Mo. banc 1992), Erickson correctly asserts it is generally reversible error to allow testimony about a plaintiff's good character during his case-in-chief. Erickson also points out that even where character is in issue, good character generally cannot be shown by evidence of specific good deeds. *Id.* at 207–08; *LaGue v. Farmers and Merchants Insurance Co.*, 779 S.W.2d 14, 16[2] (Mo.App.1989).

Plaintiff responds that the evidence was relevant to his employability as a truck driver and his earning capacity before the accident. His evidence showed the injuries to his eyes severely impaired his vision, rendering him "unemployable."

In *Kilmer v. Browning*, 806 S.W.2d 75 (Mo.App.1991), a suit by parents for wrongful death of their son, this Court stated a factor in evaluating damages is potential financial aid by the deceased, which can be shown by evidence of his earning capacity. *Id.* at 81[11]. The parents' evidence on that issue included awards received by the deceased. This Court found no abuse of discretion by the trial court in admitting the evidence. *Id.* at 81[13].

The evidence here showed United Van Lines was proceeding with a news release, presumably to reap public relations benefits from the episode. Plaintiff maintains that someone with a commendation in his work record is more likely to be employed and remain employed than someone without one.

■ As a general rule, determination of the relevance of proof offered at trial is for the sound discretion of the trial court and is not ordinarily reviewable on appeal. *Midwest Materials Co. v. Village Development Co.*, 806 S.W.2d 477, 495[24] (Mo.App.1991); *Radloff v. Penny*, 225

S.W.2d 498, 502–03[2] (Mo.App.1949). It is the general rule in a jury case that where evidence is admissible for one purpose or one issue, but inadmissible for other purposes or other issues, it should be received, and the objector then has the right to an instruction, if he requests it, limiting the extent to which and the purpose for which the jury may consider such evidence. *Dyer v. Globe–Democrat Publishing Co.*, 378 S.W.2d 570, 581[7] (Mo.1964).

After receiving the three disputed exhibits in the instant case, the trial court instructed the jury that the exhibits "were received solely as they bear on Mr. Porter's earning capacity and not as evidence of good character."

Given the discretion with which a trial court is vested in determining relevance of proffered evidence, we cannot convict the trial court here of error in receiving the evidence about which Erickson complains, particularly inasmuch as the trial court clearly informed the jurors of the limited purpose for which they could consider it. Part "A" of Erickson's second point is denied.

■ Part "B" of Erickson's second point reads:

> The court erroneously excluded the introduction of evidence of Porter's bad character as rebuttal to the erroneously permitted evidence of Porter's good character.

Although the point does not identify the "bad character" evidence, we are told in the argument following the point that there were two such items. One was an incident involving a stray cat. Erickson does not explain how that occurrence pertains to Plaintiff's employability or earning capacity, and we see no relevance.

The second item was Plaintiff's alleged loss of employment at United Van Lines because, according to Erickson's lawyer, Plaintiff's "wages got garnished 100 percent for back child support."

Plaintiff correctly points out Erickson's lawyer made no offer of proof regarding the garnishment. Additionally, Plaintiff directs our attention to deposition testimony of a United Van Lines official mentioning two garnishments, neither of which was for child support. The official avowed Plaintiff was not fired by United, but left "by his own choosing."

■ Generally, appellate courts will not review excluded evidence without a specific and definite offer of proof. *Frank v. Environmental Sanitation Management, Inc.*, 687 S.W.2d 876, 883[14] (Mo. banc 1985). A narrow exception exists where, among other circumstances, the record demonstrates a complete understanding of the excluded testimony. *Id.*

Here, the record demonstrates no such understanding. The only source to which Erickson directs us is a passage in a deposition of Nikki where she says Plaintiff left United because his ex-wife garnished his wages. That remark does not indicate United terminated Plaintiff's employment because of the garnishment.

Given the nebulousness and equivocality of the "garnishment" evidence, we cannot convict the trial court of error in excluding it. Part "B" of Erickson's second point is meritless.

■ Erickson's third point reads:

> Over objection, the court allowed plaintiff's counsel, Tom Strong, to use exhibits in opening statement that were nothing more than his argument.

From the argument following the point, we learn Erickson is complaining about one exhibit, not "exhibits." The exhibit displayed the following enlarged words:

ERICKSON

1. IMPROPERLY ASSEMBLED THE ROPER PUMP ON THE TRUCK DON WAS DRIVING
2. FAILED TO ADVISE DON THAT THERE WAS A CLOGGED FILL PIPE AT DELRAY BEACH

Erickson cites one case in support of the point, *Matter of Estate of Passman*, 537 S.W.2d 380 (Mo. banc 1976). There, a trial court allowed a lawyer to display to the jury, during opening statement, a large paper displaying various dates and an out-

line of what occurred on such dates. Noting the proof was consistent with the dates and events shown on the document, the Supreme Court of Missouri found no error, observing counsel "was simply using the paper as a visual aid to help clarify the many dates and occurrences." *Id.* at 385–86.

In opening statement here, Plaintiff's lawyer described the evidence Plaintiff intended to present to prove that the pump was improperly assembled and that Erickson failed to advise Plaintiff there was a clogged fill pipe at Delray Beach. Erickson does not contend Plaintiff failed to present the evidence he outlined.

■ The general manner and character of an opening statement are within the sound discretion of the trial court, and such discretion is subject to review by an appellate court only when abused to the prejudice of the party complaining. *Vaeth v. Gegg,* 486 S.W.2d 625, 630 (Mo.1972).

The extensive discovery and pretrial skirmishing in the instant case augured a trial of epic dimension. Obviously realizing there would be massive evidence, the trial court did not abuse its discretion in allowing Plaintiff's lawyer to display to the jury the ultimate facts toward which the evidence he outlined in opening statement would be directed. Erickson's third point is denied.

■ Erickson's fourth point reads:

The trial court erred in refusing to grant a new trial because the $3,700,000 verdict is grossly excessive and indicates bias, passion, and prejudice on the part of the jury due to trial error and improper argument by counsel.

The point's reference to "the $3,700,000 verdict" is misleading. Although the jury found Plaintiff's damages to be $3,700,000, the jury assessed 24 percent of the fault to him. As we have seen, the eventual judgment (including prejudgment interest of $225,326.42) was $2,961,326.42.

Although the point yields no clue as to which trial errors and improper argument incited the jury, we seine from the argument following the point that the "trial errors" are those raised by points one and two, which we have rejected. We are left to ponder what the "improper argument" was. We infer Erickson is referring to the argument complained of in point five, *infra.* As we shall see, Erickson's lawyer registered no objection to the argument at trial.

■ In a tort action, the determination of the amount to be awarded for personal injuries is a matter resting primarily in the discretion of the jury in that it involves the credibility of witnesses and the weight and value to be given their testimony on a fact issue. *Long v. Hooker,* 443 S.W.2d 178, 182[5] (Mo.1969). While a trial court may infer bias and prejudice from the size of a verdict alone, an appellate court may not. *Reynolds v. Arnold,* 443 S.W.2d 793, 801 (Mo.1969); *Gardner v. Reynolds,* 775 S.W.2d 173, 177[7] (Mo.App.1989). On appeal, the party against whom the verdict was rendered must first show some error or occurrence at trial sufficient to incite prejudice against him and, second, that the evidence viewed in a light most favorable to the prevailing party does not merit the verdict. *Gardner,* 775 S.W.2d at 177–78[7]; *Smith v. Archbishop of St. Louis,* 632 S.W.2d 516, 524[12] (Mo.App.1982).

Erickson has identified no such error or occurrence. Furthermore, an economics expert, testifying for Plaintiff, was asked to (a) assume Plaintiff would have worked until age 70 had he not been injured—Plaintiff was almost 44 when the accident occurred—and (b) calculate Plaintiff's "economic loss" (excluding medical expenses) resulting from the accident. The witness set the figure at $1,262,760. Plaintiff's medical expenses totaled $26,266.93.

Plaintiff's "life expectancy" when the accident occurred was 36.76 years. Plaintiff presented evidence of pain and suffering, post-traumatic stress syndrome, and limited ability for recreational activity.

Erickson cites no case with comparable circumstances indicating the verdict here is excessive. Indeed, in all three cases cited by Erickson in support of point four, the

damages assessed by the jury were upheld. Point four is meritless.

◼ Erickson's fifth point reads:

Plaintiff's improper closing argument is ground for reversal because it was plain error, even though not objected to.

Rule 84.04(d) reads:

The points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous....

◼ Erickson's fifth point fails to identify the "improper" argument and fails to explain wherein and why it was plain error. The point therefore presents nothing for review. *Thummel v. King*, 570 S.W.2d 679, 684–86 (Mo. banc 1978); *Missouri Highway and Transportation Commission v. Taylor*, 839 S.W.2d 676, 678–79[3] (Mo.App.1992); *Estate of Goslee*, 807 S.W.2d 552, 555–56 (Mo.App.1991). Furthermore, even had the point presented something for review, such review would be under Rule 84.13(c) for plain error only, inasmuch as Erickson concedes it did not object to Plaintiff's allegedly improper argument at trial. *Chong Kee Min v. Wun Sik Hong*, 802 S.W.2d 171, 176[7] (Mo.App. 1991); *Lawton v. Jewish Hospital of St. Louis*, 679 S.W.2d 370, 372 (Mo.App.1984).

◼ Relief under the plain error rule is warranted only in those exceptional circumstances when the reviewing court deems manifest injustice or a miscarriage of justice occurred. *Lawton*, 679 S.W.2d at 372[4]; *Goodman v. Firmin Desloge Hospital*, 540 S.W.2d 907, 917[22] (Mo.App. 1976).

◼ *Ex gratia* review of the passages from Plaintiff's argument complained about by Erickson reveals no manifest injustice or miscarriage of justice. Some of the comments are misdescribed by Erickson and others are retaliatory. Viewing the challenged remarks in the light of the entire record rather than in isolation, *Lewis v. Bucyrus-Erie, Inc.*, 622 S.W.2d 920, 926[8] (Mo. banc 1981), we hold no plain error relief is justified.

Finding no basis for reversal in any of Erickson's points relied on, we deny appeal 18155.

## Appeal 18157

◼ Plaintiff presents one point relied on; it avers the trial court erred in directing a verdict against Plaintiff on his claim for punitive damages against Erickson.

◼ In deciding that issue, we consider the evidence and all reasonable inferences from it in the light most favorable to Plaintiff and determine whether he made a submissible case for punitive damages against Erickson on any theory pled in his petition. *Rustici v. Weidemeyer*, 673 S.W.2d 762, 765[1] (Mo. banc 1984); *Angotti v. Celotex Corp.*, 812 S.W.2d 742, 746 (Mo.App.1991). We can uphold the directed verdict only if Plaintiff failed to do so. *Angotti*, 812 S.W.2d at 746; *Vandever v. Junior College Dist. of Metropolitan Kansas City*, 708 S.W.2d 711, 716 (Mo.App. 1986). The test to determine whether a directed verdict is correct is whether reasonable minds could differ as to the proper verdict. *Angotti*, 812 S.W.2d at 746; *Morse v. Volz*, 808 S.W.2d 424, 429 (Mo. App.1991); *Love v. Deere & Co.*, 720 S.W.2d 786, 789 (Mo.App.1986).

The pump mounted on Nikki's tractor was a Roper pump. It was installed by Mike Friggle, an Erickson mechanic. At that time, Erickson had a "grading scale" for its mechanics. Erickson classified them "A," "B," or "C." Friggle was grade "B."

Grade "A" mechanics "had to know everything from front to back ... they ... knew it all." They were allowed to work without supervision. When a "B" mechanic worked on Erickson's equipment, he was supervised by an "A" mechanic.

When Friggle installed the pump on Nikki's tractor, he was unsupervised.

The pump had an "inlet" port and an "outlet" port. To unload liquid cargo from a tank trailer, one end of a hose was hooked to an outlet valve of the tank; the other end was attached to the inlet port of the pump. A second hose was attached to

the outlet port of the pump; that hose carried the liquid to the receptacle.

The pump was a "positive displacement" pump. With each revolution, such a pump forces liquid through its outlet port. If the outlet hose becomes blocked, the pump nonetheless continues forcing liquid into it unless the pump is turned off. This will "build up pressure until something breaks."

To prevent such an occurrence, the pump on Nikki's tractor had a pressure relief device. If the pressure in the discharge port reached an excessive level, a valve was designed to open, allowing liquid to escape into the inlet, relieving the pressure.

The pump on Nikki's tractor was designed so either port could be the inlet and either port could be the outlet, depending on which direction the power source turned the pumping mechanism. Because of this, the pressure relief device was constructed so it could function regardless of which port was·which. However, the valve had to be positioned so it would receive liquid from the outlet, not the inlet.

To ensure the valve was properly positioned, the word "INLET" was cast on the pressure relief device's housing in raised letters. For the valve to function, the "IN-LET" side of the housing must face the direction opposite the outlet port. That is, a person looking into the outlet port cannot see the word "INLET" if the device is properly positioned.

Friggle mounted the pump on Nikki's tractor so the top port was the outlet and the bottom port was the inlet. However, he positioned the housing of the pressure relief device so "INLET" could be seen by a person looking into the outlet port. An Erickson grade "A" mechanic, testifying for Plaintiff, conceded the device was "180 degrees off." Consequently, although the pump operated, the pressure relief device did not.

At trial, Friggle admitted he knew that sometimes the pressure relief device had to be rotated, but his knowledge was "very limited." He also admitted new Roper pumps were accompanied by manuals, but he never read one before installing a new pump.

Plaintiff's evidence showed the accident at Delray Beach occurred because the "fill pipe" of the storage tank into which Plaintiff was pumping the sodium aluminate was clogged, therefore pressure built up in the hose until it burst. · Had the pressure relief device been positioned correctly, the valve would have opened, relieving the pressure and preventing the rupture.

▪ A plaintiff may be awarded punitive damages in a negligence suit if the defendant showed complete indifference to or conscious disregard for the safety of others. *Stojkovic v. Weller*, 802 S.W.2d 152, 155 (Mo.banc 1991). That is, punitive damages are recoverable if the defendant knew or had reason to know there was a high degree of probability that the action would result in injury. *Id.* Plaintiff contends a reasonable juror could have found the conduct of Erickson's employees met that standard. If so, Erickson could be assessed punitive damages for such conduct. *Reel v. Consolidated Inv. Co.*, 236 S.W. 43, 46[4] (Mo.1921); *Melchior v. Madesco Inv. Corp.*, 622 S.W.2d 362, 365 (Mo. App.1981).

Plaintiff lists several instances of conduct which, according to him, are sufficient to support a finding of complete indifference to, or conscious disregard for, safety of others. First, Plaintiff points out Erickson permitted Friggle, an unsupervised grade "B" mechanic, to install the pump. Plaintiff reminds us that had Friggle mounted the pump on an Erickson tractor, the job would have been checked by an "A" mechanic.

From this evidence, says Plaintiff, a reasonable juror could find Friggle was not properly trained or qualified to install the pump without supervision. Citing *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71 (Mo. banc 1990), Plaintiff asserts lack of proper training or qualifications on the part of an employee to perform an assigned task is evidence which tends to support submission of punitive damages against a corporate defendant.

In *Menaugh,* an optometry company allowed an unlicensed person to provide optometric care to a customer (eye examination, lens prescription and advice about lens care)—services properly performed only by a licensed optometrist. 799 S.W.2d at 72–73. The customer's vision was damaged because the employee supplied a cleaning solution for the customer's contact lenses that was inadequate to disinfect them and told her to abandon a previous method of disinfecting. *Id.* at 72. The Supreme Court of Missouri held the jury could find that if an unlicensed person gave advice or performed services appropriate only for a licensed optometrist, such conduct showed complete indifference to or conscious disregard for the safety of others. *Id.* at 73.

This case does not involve professional licensure; however, *Menaugh* illustrates the principle that an employee whose occupational skills are graded should not be assigned tasks for which he, absent proper supervision, lacks expertise to perform. To that extent, the holding in *Menaugh* is applicable here in view of the fact that Friggle's improper installation of the pump on the truck plaintiff drove could and did affect the pump's operation so that its malfunction resulted in serious harm to plaintiff.

 Plaintiff also cites *Blum v. Airport Terminal Services, Inc.,* 762 S.W.2d 67 (Mo.App.1988). There, an 18–year–old employee of an airport-based service company was told to refuel a piston-driven airplane with low lead aviation gasoline. Instead, he used jet fuel. Because it was incompatible with the engine, the engine failed shortly after takeoff and the plane crashed. The employee had received only one week of training in fueling (the usual was at least two) and the training did not include instruction about the catastrophic effect of putting jet fuel in piston aircraft. Furthermore, the fuel truck holding gasoline and the truck holding jet fuel were identical in appearance and had inadequate signs indicating what they contained. The nozzles and hoses bore no markings indicating the type of fuel. 762 S.W.2d at 74. *Blum* is factually more extreme than the

circumstances are in this case in that Friggle's training and experience were not so grossly lacking as that of the fuel attendant. Although its application is narrow, we accept *Blum* as illustrating that failure to properly train an employee to perform a task that, if improperly performed, threatens death or serious harm can suffice as a basis to award punitive damages.

The second instance of conduct to which Plaintiff directs us is that Friggle failed to follow the instructions in the Roper manual when he installed the pump, failed to run any post-installation tests required by the manual to determine whether the pressure relief device was functioning, and failed to give Plaintiff an owner's manual which could have helped Plaintiff discover the device was installed backwards. From such conduct, says Plaintiff, a reasonable juror could find complete indifference to, or conscious disregard for, safety of others.

Plaintiff relies on four cases. Two have already been discussed: *Menaugh* and *Blum.* The other two are *Stojkovic,* 802 S.W.2d 152, and *Schroeder v. Lester E. Cox Medical Ctr.,* 833 S.W.2d 411 (Mo.App. 1992).

In *Stojkovic* a passenger was injured when the vehicle in which she was riding was struck by a vehicle operated by a drunken driver. The Supreme Court of Missouri held there was evidence of erratic driving manifesting a reckless disregard of consequences exacerbated by intoxication, from which a jury could find the driver knew or had reason to know there was a high degree of probability that his action would result in injury. 802 S.W.2d at 155. Consequently, the passenger's claim for punitive damages should have been submitted to the jury. The Court added that the purpose of punitive damages (deterring reckless conduct) could hardly be better served than in alcohol-related driving cases. *Id.* The reprehensible conduct in *Stojkovic* does not exist here.

Circumstances in *Schroeder* are more akin to those in this case. In *Schroeder,* a hospital patient died while undergoing surgery. Death was caused by an improperly mixed "cardioplegic" solution, prepared in

the hospital pharmacy and administered during the operation. The patient's surviving spouse and son sued the hospital. The trial court instructed the jurors they could award damages for aggravating circumstances if they found the hospital's conduct was outrageous because of reckless indifference to the rights of others. 833 S.W.2d at 423. This Court held the evidence was sufficient to support the submission.

In *Schroeder* the solution was mixed by a device called a "compounder." The evidence indicated the compounder malfunctioned, producing a solution lacking the necessary amount of the critical ingredient. During the ten minutes that the compounder was preparing the solution, the pharmacist performed other tasks. There was evidence that had the pharmacist watched the compounder, she would have seen the malfunction. There was also evidence that the hospital had no policy requiring its pharmacists to observe the operation of the compounder, and that such was inconsistent with good standard practice. 833 S.W.2d at 422–23. Additionally, the pharmacist testified that she had never read the compounder manufacturer's manual regarding the proper operation and monitoring of the machine although it was available in the pharmacy. *Id.* at 417–418. There was evidence that the manufacturer's manual stated the operator should observe the operation of the compounder to make sure that "an adequate fluid transfer" occurred. *Id.* at 418. The pharmacy did not have a policy of "end-testing", i.e. analyzing the substance after it was produced to assure it contained the proper ingredients. *Id.* at 418. The pharmacy director acknowledged that if the product had been end-tested, "decedent would 'probably' be alive today." *Id.*

In *Schroeder,* this court said:

A reasonable juror could properly infer that any mechanical device is capable of malfunctioning....

This solution was compounded for the specific purpose of using it to protect a ▪ human heart from damage while it was stopped. The potential of harm arising

from miscompounding could not have been greater.

*Id.* at 423.

The parallels between the pharmacist's actions (or inactions) and the conduct of Erickson's employee Friggle include failure to read the manufacturer's manual regarding the proper use (the pharmacist) or installation (Friggle) of a machine even though the respective manual was available and the failure to test the product of their labors after their respective tasks were completed. The pharmacist failed to determine that the solution she produced contained the prescribed ingredients. Friggle failed to determine if the pressure relief device would function as intended following installation of the pump on the truck plaintiff would be driving.

In *Schroeder,* upon use of the substance in the manner intended, the effect of an absence of the required ingredient was tragically assured. The patient for whose surgery the substance was prepared could not survive. In this case, the effect of failing to properly install the pump so that its pressure relief device would function was to cause some part of the pumping system to burst and to expel the substance being pumped from the trailer externally, under high pressure. Although death or serious harm was not assured upon the pressure relief device failing to function, a jury could find that Erickson "knew or had reason to know that there was a high degree of probability that the action would result in injury." *Stojkovic,* 802 S.W.2d at 155. Upon a bursting of a part of the pumping system so as to discharge the substance hauled—a hazardous substance—a jury could have found a high degree of probability that a person operating the pumping system or otherwise present or assisting with the unloading process would be struck by the discharge and injured or even killed.

Mindful of the caution sounded in *Menaugh v. Resler Optometry,* 799 S.W.2d at 75, "that punitive damages are to be the exception rather than the rule," and that they depend on willful wrongdoing, or recklessness which is the legal equivalent of

willfulness," *Id.*, we hold that a jury could have found that, under the circumstances in this case, Erickson's conduct amounted to a conscious disregard for the safety of others so as to constitute such recklessness. Plaintiff's point in No. 18157 that the trial court erred in directing a verdict against him on his claim for punitive damages against Erickson is well-taken.

In No. 18155, the part of the judgment based on the verdict and the part of the judgment based on the order granting Plaintiff's motion for summary judgment on Erickson's "workers' compensation" defense are affirmed. In No. 18157, the part of the judgment that directed verdict for Erickson on Plaintiff's claim for punitive damages is reversed. The case is remanded for new trial only as to the issue of punitive damages.

CROW, Presiding Judge, concurring in part and dissenting in part.

I concur in the portion of the scholarly principal opinion adjudicating Erickson's appeal (18155). I respectfully dissent in the portion adjudicating Plaintiff's appeal (18157). To me, the cases on which Plaintiff relies to support his contention that he made a submissible case against Erickson for punitive damages are too dissimilar to be persuasive here.

In *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71 (Mo. banc 1990), an optometry company allowed an unlicensed person to provide optometric care that only a licensed optometrist could legally render. That was the basis for the holding by the Supreme Court of Missouri that a jury could find conduct manifesting complete indifference to or conscious disregard for the safety of others. *Id.* at 73.

As observed in the principal opinion, nothing in the instant case suggests a mechanic installing a Roper pump is required to be licensed. Friggle had been an Erickson mechanic seven years when he installed Nikki's pump. He had started at grade "C" and risen to grade "B." He testified without contradiction that he had installed "around 15" pumps. Plaintiff directs us to no evidence indicating Friggle installed any pump incorrectly except Nikki's.

In *Blum v. Airport Terminal Services, Inc.*, 762 S.W.2d 67 (Mo.App.1988), the 18–year–old employee had received only one week of training in fueling aircraft instead of the customary two. The night he made the fatal error was his first on duty alone. *Id.* at 69. The training he had received did not include instruction about the catastrophic effect of putting jet fuel in piston aircraft. Additionally, the safety checklist and instructions furnished him mentioned nothing about preventing misfueling, even though it had been a recognized problem in aviation for many years. *Id.* at 74.

Here, as noted above, Friggle was an experienced mechanic who had evidently installed some 15 similar pumps without mishap. While he did not run a post-installation test to determine whether the pressure relief device functioned properly, he did run the pump to ensure it worked (which it did).

*Stojkovic v. Weller*, 802 S.W.2d 152 (Mo. banc 1991), cited by Plaintiff, involved a drunken driver who ran a red light at a busy intersection, caused an accident, then fled the scene. No such criminal conduct exists here.

*Schroeder v. Lester E. Cox Medical Ctr.*, 833 S.W.2d 411 (Mo.App.1992), also cited by Plaintiff, is discussed in detail in the principal opinion. What appears there need not be repeated. However, there are significant differences between *Schroeder* and the instant case.

In *Schroeder*, a pharmacist used an instrument to prepare a vital medication for a patient undergoing heart surgery. The manufacturer's manual cautioned the operator to observe the instrument to make sure an adequate fluid transfer occurred. Instead, the pharmacist performed other tasks while the instrument was preparing the medication. Had the pharmacist watched the instrument, she would have seen the malfunction, thereby preventing the fatality.

Here, Friggle was not operating an instrument that produced a critical medication for a surgical patient. He was installing a mechanical device on a tractor.

There is no evidence he gave the task anything other than his full attention or best effort, or that he slighted the job in haste to finish it. While he did not read instruction manuals before installing pumps, he had read "specifics" in the manuals and had received oral instructions on how to put them on.

The facts here are closer to *Sledge v. Town & Country Tire Centers, Inc.,* 654 S.W.2d 176 (Mo.App.1983). A mechanic, in replacing rear axle bearings on a motor vehicle, failed to pack some of them with grease. This caused excessive heating of the axle, which resulted in it breaking. The vehicle left the highway and crashed, injuring a passenger. She sued, recovering actual and punitive damages. On appeal, the Eastern District of this Court reversed the punitive damages, saying:

> [The passenger] bases [her] argument upon the knowledge of the mechanic that improper lubrication could result in overheating and axle breakage and that with such knowledge he failed to consult a manual which gave the correct method of lubrication of this vehicle. But the only evidence in the record is that the mechanic believed from his experience and from his visual inspection of the axle and bearings that the method he utilized was the correct one. His actual or constructive knowledge that injury could occur if he was negligent was an element of defendant's duty. It does not supply the knowing violation of that duty necessary to support punitive damages. The mechanic utilized a method he believed to be correct; he was negligent in so doing but he did not knowingly act improperly nor was he indifferent to or in conscious disregard of plaintiff's safety.

654 S.W.2d at 182.

Plaintiff asserts Erickson's mechanics should have discovered the improper positioning of the pressure relief device when Plaintiff reported difficulties with the pump prior to the accident.

Plaintiff testified that the first time he used the pump to unload liquid cargo, the "overclamps on the hose connectors were trying to vibrate open." He reported this to Erickson and was told to "wire them down."

The second time he used the pump, Plaintiff experienced the same problem. He took the tractor to Erickson's shop, where mechanics installed a "bleed valve" on the pump. Plaintiff maintains that in doing so, the mechanics should have noticed the pressure relief device was "backwards."

While the failure to detect the improper positioning of the pressure relief device may have constituted negligence, we fail to see how the oversight demonstrates complete indifference to, or conscious disregard for, Plaintiff's safety. On the contrary, the evidence manifests a good faith effort to correct the problem Plaintiff reported about the pump. Asked the mechanics' explanation for installing the bleed valve, Plaintiff testified:

> ... they thought maybe when you open the rear valves on the tank and you allow product into your hoses, that pushes a volume of air up to the pump, that it might be air locking the pump, and if you open the bleed valve you could bleed the air out until you got product and then shut it off and you wouldn't have any air.

While the bleed valve was the wrong remedy, it was nonetheless a conscientious attempt to solve the problem.

In sum, the evidence demonstrates Friggle made a mistake in positioning the pressure relief device on the pump, and his error was not detected by other Erickson mechanics when they added the bleed valve.

In *Menaugh,* 799 S.W.2d at 75, the Supreme Court of Missouri cautioned:

> ... the uniform tenor of the recent cases is that punitive damages are to be the exception rather than the rule, and that they are to be confined to cases in which the evidence supports the award. The phraseology differs in different kinds of cases, but all depend on willful wrongdoing, or recklessness which is the legal equivalent of willfulness.

The trial court here heeded that message, obviously concluding no reasonable

juror could convict Erickson of such culpability. I agree.

The principal opinion erodes the standard for punitive damages. The line separating conduct manifesting complete indifference to, or conscious disregard for, the safety of others (MAI 10.02 [1983 Revision]) from ordinary negligence is obliterated. Suers are encouraged to seek punitive damages from anyone who fails to exercise ordinary care. Trial courts are compelled to instruct the jury on punitive damages. If awarded, such damages will be insulated on appeal.

I would affirm the judgment in all respects.